Staples, J.,
delivered the opinion of the court.
The appellants, being the owners of property in the county of Rockingham, known as “ Craney Island Mills,” and the appellee, being the holder of twenty shares of stock in the Rawley Springs Company, entered into a negotiation which resulted in exchanging the mills property for the stock. And thereupon the appellee assigned to the appellants the certificate of stock, and the latter conveyed to the former the property by deed with proper covenants of warranty. This was in February, 1876. It was shortly afterwards ascertained that at the time of the exchange the Rawley Springs Company was insolvent and its stock utterly worthless, so that the appellee has in fact acquired the “Craney Island Mills,” worth twenty-five hundred dollars or more, in exchange for a commodity confessedly valueless.
The appellants, in their bill asking for a rescisión of the contract, base their claims to relief on two grounds. First, a false and fraudulent representation of the value of the stock by the appellee, known by him at the time to be such, and made by him with intent to deceive. Second, even though the appellee did not know at the time the representation to be false, he is nevertheless responsible, *296 ^ because he was a stockholder of the company and as such it was his duty to know and to give correct information of -the value of this stock. The appellee, in his answer,’denies any fraudulent intent or misrepresentation; he denies that he induced the appellants to sell and convey the property by representing the stock as worth §2,500, or any other sum; or that he used any language which could possibly be construed as a representation that the stock was worth more than its full value, or worth its nominal value. He avers that he knew nothing personally about the stock, and referred the appellant, Samuel Grim, to certain parties for the necessary information. The evidence is, perhaps, not sufficient to convict the appellee of any wilful misrepresentation of the value of the stock. It must be admitted, however, that there are circumstances of grave suspicion against him throughout the whole transaction with the appellants.
The appellant Samuel Grim, with whom the contract was made, has given his deposition in the case. He states that the appellee represented the stock as worth “ above par,” and that the appellant “ could not make a better investment.” Another witness—Abraham Andes—proves that the appellee admitted to him that the appellant Grim had correctly stated in his deposition what the appellee had said in respect to the stock as a good and safe investment, but that he (the appellee) was honest in his representation of the stock.
Another witness—"W". H. Hopkins—says the appellee told him that he was going to trade the stock to Mr. Grim for his mill; and the appellee further said that he thought the stock was good, and had so represented it to Mr. Grim. The testimony of these witnesses completely overthrows the "answer, so far as it denies any representation of the value of the stock, and places it beyond question that the appellee, in this particular, has not given a truthful account of the transaction. *297 But this is by no means the whole case, as made by the proofs.
The appellant Samuel Grim, in his deposition, has rated, at considerable length, his version of the transaction. He tells us very explicitly what was said by the appellee during the progress of the negotiation. He says he asked the appellee if the company was in debt, and he answered the debt was about sixty thousand dollars; but the company had been offered $100,000 for the property; that $40,000 of the stock had been sold, and the capital stock was $100,000; that the president of the company had told him he was about negotiating for a loan of money to fund the debt against the property, and then they would declare a dividend of what they had made at the springs, and they would sell the balance of the stock and pay off the debt.
The witness further stated that the appellee told him they were going to issue stock for the 11J and 17J per cent, they had made the previous seasons, and this would make over $2,500, and the appellant would have to give him $500 in the boot. How, if these representations were not made by the appellee, it is difficult to understand why he did not say so. He was present when the deposition was taken, and cross-examined the appellant at great length and with considerable skill. He shortly afterwards gave his own deposition, and he not only did not deny the statements attributed to him, but his counsel was careful to avoid all allusion to them. It is most apparent that this omission did not proceed from inadvertence or forgetfulness, but was the result of a deliberate purpose. The testimony of the appellant must, therefore, be taken as true. This conclusion cannot be avoided, without disregarding the plainest presumptions arising from the conduct of men.
Treating the appellant’s testimony as true, it convicts the appellee of the grossest misrepresentation with respect *298 to the condition and resources of the Rawley Springs Company. The debt of the company, instead of being $60,000 as represented by him, amounted to nearly one hundred thousand dollars, with incumbrances on the property amounting to $60,000 or $80,000, the existence of which he never mentioned, and which he must have known at the time. The statement that $100,000 had been offered for the property; that the president of the company was about negotiating a loan to pay off the debt against the property, did not have the slightest foundation in fact; and the same might be said with respect to the statement of the 11-|- and the 17¿ per cent, alleged to have been realized in 1874 and 1875, for which additional stock was tobe issued. The season of 1875, was a very disastrous one. So much so, .that at its close, the company could not pay its ordinary current bills. No dividend was declared, or could have been honestly declared, or new stock issued by a company pressed down with such heavy liabilities. When the appellee undertook to assert that this profit had been realized, and that it would be divided among the stockholders in the form of stock, he made the strongest possible assertion of the solidity and prosperity of the company; one most calculated to impress a stranger with the most extravagant ideas of the value of the stock.
The appellant testifies that after the article of agreement was drawn, he asked the appellee if he would have to have anything to show to get that extra stock, which was for the 11J and the 17-?,- per cent, which they were about to issue; and he said “ No, that he would assign the certificate of stock, all his right and title, and that would be sufficient.”
This testimony explains how it was that the mill property, alleged in the bill to be worth $2,500, not denied in the answer, and fully proved by the evidence, was exchanged for twenty shares of stock, the par value of which was one hundred dollars.
*299 The record discloses the fact, that at the time these representations were made the Rawley Springs Company was hopelessly insolvent. The floating debt amounted nearly forty thousand dollars; and the incumbrances upon its property, $60,000 bearing 10 per cent, interest, Five shares of the stock were sold in the spring of 187.6 for $2.50, and in the spring of 1877 the entire property was sold for a great deal less than its indebtedness, and the company dissolved and its existence terminated. The record further shows that since the dissolution of the company a bill has been filed in the circuit court of Rocking-ham county in behalf of its creditors; the object of which is to make the shareholders, at the time of the dissolution, individually responsible to the extent of their respective shares of stock for all the debts of the company. To this bill the appellants are made defendants along with the other shareholders, and a decree asked against them for contribution. It does not appear whether such a decree has been obtained, or what further steps have been taken in the prosecution of the suit. The appellants, in their bill, set forth the pendency of this suit and the expensive litigation to which they are to be subjected, as an additional reason of a rescisión of the contract. The appellee, in his answer, says it may be true that complainant, when he became the owner of the said twenty shares of stock, was receiving a ticket to an unlimited number of law suits, growing out of .the holding of said certificates. Such is life; that no such result was inticipated by reponsdent— it was caused by the hard times.
Row, whether this result was anticipated by the appellee, or whether he was aware of the condition of the company at the time of the sale of the stocks, it is impossible, to say. It is difficult to believe that he did not. have more accurate information on the subject than he imparted to the appellant, or that he, now professes to have. He attended a stockholders’ meeting in October, 1875, a few *300 _ months before the sale, and must have heard the condition and prospects of the company discussed at the time. He - is a man of intelligence, and it is incredible that he did not inform himself of matters to some extent it materially served him to know.
One of the witnesses testified that the appellee had told him he had long known the stock was worthless. However that may be, whether he was aware of the condition of the company, or that the stock was valueless, is not material to the purposes of the present inquiry. He is responsible for his representations to the same extent as if they were falsely and fraudulently made.
Whatever conflict of opinion may have existed in the English writers on this subject, the doctrine is believed to-be well settled in the United States, that a false representation of a material fact, constituting an inducement to the contrae!, on which the purchaser had the right to rely, is a ground for a rescisión by a court of equity, although the party making the representation was ignorant as to whether it was true or false; and the real inquiry is not whether the vendor knew the representation to be false, but whether the purchaser believed it to be true, and was misled by it in entering into the contract. For in such case, whether the false representation was innocently made or knowingly made, the effect is the same upon the purchaser. In Story’s Equity Jurisprudence, the rule is thus laid down: Whether the party thus misrepresenting the material fact knew it to be false or made the assertion without knowing whether it was true or false, is wholly immaterial; for the affirmation of what one does not know or believe to be true is equally, in morals and in law, unjustifiable as the affirmation of what is known to be positively false. And even if the party innocently misrepresents a material fact by mistake, it is equally conclusive, for it operates as a surprise and imposition upon the other party. 1 Story Equity, § 193, note. In Smith v. Richards, 13 Peters’ R. *301 26, the supreme court of the United States said: “It immaterial to the purchaser whether the misrepresentation proceeded from fraud or mistake. The injury to him the same, whatever may have been the motives of the seller. See also Adam’s Equity, mar. p. 177, and note; 2 Parson on Contracts, 177; 1 Story on Contracts, §632, and notes of cases cited—note 3; Bispham P. of Equity, 268.
The doctrine of these cases was substantially affirmed by this court, in Crump v. United States Mining Co., 7 Gratt. 352. It was there decided, that in written proposals of sale for stock in a mining company, if the representations contained therein are false as to any material fact, by which the purchasers have been misled to their injury, and in which they are presumed to have trusted to the vendors, the contract founded on such misrepresentation is void, whether the vendors knew the representation to be false at the time they were made or not, and whether made with fraudulent intent or not.
It has been said, however, that in the case before us, the representations were matters of opinion, in respect to which the appellant was as competent to form an opinion as the appellee. The means of information were equally accessible to both parties. That one of the appellants did in fact make inquiries, with a view to satisfy himself of the value of the stock, and relied upon the information thus obtained, and not upon the representation of the appellee.
Now, it may be conceded, that in all this class of cases, the representations must, as a general rule, be of a fact, as distinguished from a mere matter of opinion which ordinarily is not presumed to deceive or mislead. But even a matter of opinion may amount to an affirmation, and be the inducement to a contract, especially where the parties are not dealing upon equal terms, and one of them has, or is presumed to have, means of information *302 not equally open to the other. Pomeroy on Contracts,, §212; 1 Story on Contracts, §197.
It is also true, that if the purchaser does not rely on the representations of the seller, but seeks information from other sources, the law will often impute to him all the knowledge necessary to a proper understanding of the facts.
But it is equally true, if the purchaser has not equal means of information with the seller, if it be a case in which he had the right to rely upon the representation, the evidence to show that he did not rely upon it, but upon information obtained elsewhere, must be of the clearest and most satisfactory character. In such cases, there ought to be no room for inference on mere implication. Pomeroy on Contracts, §§ 221, 4, 5 and 6. See also Slaughter’s adm’r v. Gerson, 13 Wall. U. S. R. 379.
It has already been seen that the appellee, pending the negotiations, declared that the appellants could not make a better investment than to purchase the stock. This did not profess to be a mere opinion, but the positive affirmation of a fact. But even if it is to be regarded as an opinion merely, it was avowedly based upon certain information the appellee professed to have, touching the indebtedness of the company, the value of its property, the amount of its stock sold, the dividends declared. The appellants had the right to rely upon these statements; they had the right to suppose the appellee had correctly informed himself. He was a stockholder of the company, and therefore presumed to know something of its resources and liabilities. He had means of information not accessible to the appellants. He had the undisputed privilege at any time to inspect the records and books of the company, and make himself familiar with its condition—a privilege not accorded to any stranger—and when he undertook to make statements of the value of the stock, and the assets and the liabilities of the company, third persons had. the right to *303 presume he had made the necessary examination, and to rely upon what he said. Instead of referring the appellants to the books of the company, and aiding them gaining access to these books, he referred them to one or more of the stockholders, who might well be presumed, like himself, to entertain the most favorable opinions the stock, and to wish to impress others with that opinion.
The appellants, or one of them, it seems did apply to one of the persons named; but it is very questionable, to say the least, whether any response was obtained from the person applied to, until after the contract was closed.
No one can read the record without being satisfied that the appellant most active in making the trade had the most implicit confidence in the good faith, as well as the sound judgment of the appellee, and that in purchasing the stock he relied almost exclusively upon the statements of the latter. Under all these circumstances, the appellee cannot now be heard to say that his representation was a mere matter of opinion, or that he honestly believed it to be true, or that the appellants were not influenced by it in purchasing the stock.
In any and every view in which the case may be considered, it is one calling for the interposition of a court of equity.
The decree of the circuit court must, therefore, be reversed, the contract of the 20th February, 1876, be rescinded, and the cause remanded to the circuit court, that an account of the rents and profits may be taken, subject to any credit to which the appellee may be entitled for permanent improvements and other proper charges incurred by him.
The decree was as follows :
This day came again the parties by their counsel, and the court, having maturely considered the transcript of the record of the decree aforesaid, and the arguments of coun *304 se^’ °P^n^0Ib f°r reasons stated in writing and filed with the record, that the circuit court erred in dismissing original, amended and supplemental bills of the appellants, this court being of opinion that the appellants are entitled, upon the pleadings and proofs, to a rescisión Qf £jje contract of the 1st of February, 187G. It is therefore decreed and ordered that the said decree be reversed and annulled, and that the appellants recover against the appellee their costs by them expended in the prosecution their appeal and supersedeas aforesaid here.
And this court, proceeding to pronounce such decree as the said circuit court ought have pronounced, doth decree and order that the deed executed by the appellants to the appellee on the said first day of February, 1876, be and the same is hereby annulled and the contract rescinded. It is further decreed and ordered that the appellee reconvey the property to the appellants by proper deed of release, and that he surrender the posession of the same to the appellants; that the appellants reassign to the appellee the certificate of twenty shares of stock in the Rawley Springs Company; that an account be taken, if required by the appellants, of the rents and profits of the land from the time the appellee acquired possession of the same, subject to any just and ^proper credits to which the appellee may be entitled by reason of taxes, or other proper charges, on the property,, and any permanent improvements the appellee may have made thereon; such credits, however, not to exceed the value of the rents and profits of the land and premises.
Which is ordered to be certified to the said circuit court of Rockingham connty.
Though Judges Honour e and Anderson were absent when the opinion was delivered, they had previously concurred in it in conference.
Decree reversed.