# Wytheville

## JORDAN AND OTHERS V. WALKER.

### June 12, 1913.

1. TRIAL—*Case for Jury*.—An action for deceit is peculiarly one for the consideration of a jury when the conclusions to be drawn from the evidence are not so certain and incontrovertible that fair minded men may not differ with respect thereto.

2. DEMURRER TO EVIDENCE—*Conflicting Evidence—Judgment*.—Upon a demurrer to the evidence, where the evidence is conflicting and is of such character that the jury might have found a verdict for the demurree, it is the duty of the court to enter judgment in his favor.

3. FALSE REPRESENTATIONS—*Reliance Upon—Inquiry*.—One to whom a representation has been made as an inducement to enter into a contract has the right to rely upon it as true *quoad* the maker, and he need make no further inquiry ; and if he does so rely upon it, and it turns out to be untrue, the party making the representation is liable for the resulting damages, which may be recovered in an action of deceit.

4. FALSE REPRESENTATIONS—*Reliance Upon—Question for Jury*.— Whether the plaintiff in action of deceit (to recover damages for the false representations of the defendant) relied upon the defendant's representations, or acted in whole or in part on his own knowledge, is a question for the jury.

5. TORTS—*Joint Wrong-Doers—Participation*.—Where one party is a participant in and a beneficiary of the wrong of another, which could not have been made effectual without his co-operation, the two are jointly liable to the party injured.

Error to a judgment of the Circuit Court of Greensville county, in an action of trespass on the case. Judgment for the plaintiff. Defendants assign error.

*Affirmed.*

The opinion states the case.

*S. V. Southall* and *Richard B. Davis & Son,* for the plaintiffs in error.

*Buford, Lewis & Peterson* and *E. C. Palmer,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

The material facts out of which this litigation arises are as follows: The Tillar-Smith Hardware Company, incorporated under the laws of Virginia, was organized on January 1, 1906, with a capital stock of $12,500, divided into shares of $100 each, having its principal office at Emporia, Greensville county, Virginia, of which stock W. T. Tillar held $3,000, J. H. Smith $3,000, Rupert Ivey $500, L. G. Walker $3,000, R. W. Jordan $2,000, and B. D. Tillar $1,000. All of the stockholders at that time resided in the town of Emporia, and at the organization of the company L. G. Walker became one of its directors and its vice-president, but owing to other business engagements he was unable to give his personal attention to the affairs of the company, and soon afterwards removed from Emporia and engaged in business elsewhere, and before the year 1909 he had ceased to be a director or to hold any official connection with said company. W. T. Tillar was president of the company from its organization, and J. H. Smith its business manager, who together with R. W. Jordan and L. G. Walker were its directors, while B. D. Tillar was a clerk in the store kept by the company; both Jordan and B. D. Tillar being connected with the company "the entire time it was running," and both familiar with its affairs and knowing its financial status. The business of the company, it seems, was prosperous during the years of 1906 and 1907, and a dividend of about ten *per cent.* on its stock was declared in January, 1907, and again in January, 1908,

but, during the year 1908, the company purchased and operated for a while a manufacturing plant which resulted in financial losses, whereby the capital stock of the company was somewhat impaired. Early in 1909 L. G. Walker became dissatisfied with the management of the affairs of the company—first, because J. H. Smith, its manager, had overdrawn his account to the amount of $1,368; and second, because the company had engaged in the manufacturing business, which he regarded as being beyond the scope of the business for which the company had been chartered; and, thereupon, he (Walker), accompanied by his counsel, went to Emporia to inquire into these two matters, and, in ascertaining the status of Smith's account, Walker's counsel had to be assisted by the bookkeeper of the company. This investigation, it appears, resulted in a determination on the part of Walker to institute legal proceedings to require Smith to settle his account, and perhaps to remove him from the position of manager, and to prevent the company from engaging further in the "mill" business, which determination on the part of Walker was communicated to Jordan in an interview about March 18, 1901. On the day following this interview, Jordan wrote to Walker, who was then at Danville, Va., endeavoring to dissuade him from instituting the threatened legal proceedings, and suggesting the plan of buying up enough of the stock of the company to give control of the management of its affairs, and expressing a willingness to sell his stock and to aid in acquiring other shares of the stock. Then followed a lengthy correspondence between these parties, in which it appeared that Jordan and B. D. Tillar were, in fact, endeavoring to effect a sale of their stock, but Walker throughout stated that he did not wish to buy, and that he would only go so far as to unite with Jordan to get new parties interested in the business and to acquire a controlling interest in the stock, so that they might manage the busi-

ness more satisfactorily; Walker believing then, as he had every reason to believe, from what had passed between him and Jordan, and to continue to believe from their subsequent dealings, that he and Jordan were co-operating in good faith to accomplish the same purpose; and it seems not to have occurred to Walker that such was not the case until after he had become the purchaser of the holdings of Jordan, B. D. Tillar and Rupert Ivey in the company.

As a result of these negotiations, Walker, on July 31, 1909, went to Emporia with the view of interesting a Mr. Harper in the business, and to have him (a capable man) undertake the management of the company's affairs, and there and then Jordan, assisted by B. D. Tillar, went over the books and furnished Walker with a statement showing what the company owed, its assets, etc., by which it was made to appear that the business could pay all of its debts, pay the stockholders what they had put in and still have a surplus left of about $3,000. Harper, however, did not become interested in the business, and later and after further interview with Jordan, Walker, relying upon the truth of the statement as to the condition of the company's affairs made up by Jordan and B. D. Tillar, decided to take over to himself the stock of Jordan, B. D. Tillar and Ivey, and accordingly, on August 3, 1909, he made settlement with these parties for their stock and placed his (Walker's) brother temporarily in charge of the business. Having purchased this stock under the circumstances narrated, Walker left Emporia, and in the course of a few days received from his brother, who had been temporarily put in charge of the business, a letter stating that the affairs of the company were in a desperate condition. He also received a letter from W. T. Tillar of similar import, and acting upon this information he returned to Emporia and sought an interview with Jordan, the result of which was that Jordan did not deny the truth as asserted by Walker,

but refused to take back his stock, as Walker claimed he had agreed to do, giving as his only reason for refusing to do so that he had hypothecated the note given by Walker in part payment for his (Jordan's) stock to a third party.

This action was brought by Walker on the 3rd day of January, 1910, against R. W. Jordan and B. D. Tillar to recover damages for false representations made by them as to the financial condition of the said company, by means of which representations the plaintiff alleged that he was induced to purchase thirty-five shares of the capital stock of the company for the aggregate sum of $2,650.

There were two trials of the case—the first at the April term of the circuit court, 1910, resulting in a verdict for the plaintiff, which verdict was, on October 3, 1911, set aside by the court and a new trial ordered. On the second trial at the conclusion of the evidence the defendants demurred thereto, in which demurrer the plaintiff joined, and in the conditional verdict rendered by the jury they assessed the plaintiff's damages at the sum of $2,650.00, with interest on $1,150.00, part thereof, from the 4th day of November, 1909, and on $1,500.000, the residue thereof, from the 3rd day of February, 1910, until paid, subject to a credit of $1,500.00 as of the 3rd day of February, 1910, the amount of the note executed by the plaintiff to the defendant, R. W. Jordan, for the stock purchased of him." The court overruled the demurrer and rendered judgment for the plaintiff in accordance with the verdict of the jury, to which judgment the defendant obtained this writ of error.

In addition to the facts already stated, a material fact alleged, and which the evidence tended to prove, was the false representation made by plaintiffs in error, and which operated as a principal inducement to defendant in error to buy the stock in question, that the entire liabilities of the company did not exceed $12,000, when in fact they were

8

almost or quite double that amount. Relying, as he al-
leges, upon the truth of this and the other false represen-
tations made by plaintiffs in error, defendant in error pur-
chased of Jordan twenty shares of his stock and five shares
owned by Ivey, on which Jordan had procured an option
for the purpose of enabling him to make a more advan-
tageous sale of his own stock; and of B. D. Tillar ten
shares. He executed to Jordan a note for $1,500 in part
payment for his stock, and delivered to him a certified
check for $400 for Ivey's stock; and paid Tillar in cash
$500 and executed his note for $250, which Tillar dis-
counted at bank and defendant in error paid to the bank
at maturity. The aggregate of the prices so paid consti-
tutes the amount of damages awarded by the verdict of
the jury and the judgment of the trial court in favor of
defendant in error, which verdict and judgment, in effect,
and were doubtless so intended, restore the parties to the
litigation to the position they would have occupied had
not the sale of the stock in question to defendant in error
been consummated.

The questions arising upon the issue presented in the
**record are:** (1) Was there a false representation of a
material fact made by plaintiffs in error to the defendant
in error? (2) Did the plaintiffs in error know that the
representation was false, or was it made by them so reck-
lessly as to amount to fraud? (3) Did the representation
operate as an inducement to defendant in error to pur-
chase the stock? (4) Was the defendant in error justified
under the circumstances in relying upon the representa-
tion? (5) Did the defendant in error, notwithstanding
the representation, undertake an independent examina-
tion of his own to ascertain the liabilities of the company?
(6) Did defendant in error suffer damage as a result of
the representation?

The case thus presented was pecurliarly one for the de-

termination of the jury, since the conclusions to be drawn from the evidence were not so certain and incontrovertible that fair-minded men might not have differed with respect thereto.

The plaintiffs in error were clearly shown by the evidence to have been in a position to know the truth or falsity of the representations made by them to defendant in error as an inducement to him to buy their stock, while defendant in error was not. Plaintiff in error, Jordan, was a director continuously from the organization of the company until August 4, 1909, the date of the sale of his stock to defendant in error; he had been elected vice-president in the place of defendant in error, and held that position during the year 1909 until he sold his stock; was an expert bookkeeper and acted for a time as treasurer of the company; knew as early as the summer or fall of 1908 that the company was financially embarrassed and that on April 1, 1909, the bookkeeper for the company resigned her position because her salary of $40 per month could not be paid. His coplaintiff in error, B. D. Tillar, was connected with the company "the entire time it was running," in the capacities of salesman, one of the directors and manager, and in these circumstances the two, pretending their co-operation with the defendant in error to bring about a better condition of the affairs of the company so that its business might be more satisfactorily conducted, made up, on the night of July 31, 1909, a false statement of the liabilities and explaining the apparent solvency of the company, and also falsely declaring that the company had then recently paid off a considerable portion of its indebtedness, which statement was furnished to defendant in error by Jordan and B. D. Tillar, they well knowing that he would act upon it as well as upon other representations made to him as to the condition of the company's business, for the manifest reason that he, (defendant in

error) had been away from Emporia for a long while, and had every reason to believe that Jordan, at least, was co-operating with him, in good faith, in the efforts to put the company upon a better footing; and that its affairs could be thereafter successfully conducted.

We do not consider it necessary to review the evidence in the case further than has been done, since the testimony of the principal actors in the transaction of which defendant in error complains is conflicting on all essential points, and there is evidence amply sufficient to have justified a verdict by the jury in favor of defendant in error upon every question of fact presented, and it is hardly necessary to cite authority for the proposition that if the jury could have so found this court, upon the demurrer to the evidence, must so find.

The rule is clearly stated in *C. & O. Ry. Co.* v. *Corbin,* 110 Va. 700, 67 S. E. 179, where it is held: "Upon a demurrer to the evidence, where the evidence is such that the jury might have found for the demurree, it is the duty of the court to enter judgment in his favor."

Plaintiffs in error's own evidence does not, by any means, refute the charge that they represented to defendant in error, not only the solvency of the company, but that it had a surplus of $3,000 in excess of its liabilities and capital stock, when in fact it was then hopelessly insolvent, and that in the receivership proceedings which ensued shortly afterwards the assets were found sufficient to pay the creditors only about thirty *per cent.* of their debts, and, therefore, the stock was utterly worthless; but they insist that though this was all true, defendant in error is not entitled to recover in this action as he did, or ought to have investigated for himself to find that the representations that had been made to him as to the financial condition of the company were false.

"Where it is established that there has been any fraudu-

lent representation by which a person has been induced to enter into a contract, it is no answer to his claim to be relieved from it to tell him that he might have known the truth by proper inquiry. He has a right to retort upon his objector, 'You, at least, who have stated what is untrue, or have concealed the truth for the purpose of drawing me into a contract, cannot accuse me of want of caution because I relied implicitly upon your fairness and honesty.'" *West End L. Co.* v. *Claiborne,* 97 Va. 734, 34 S. E. 900.

If one represents as true what he knows to be false, in such a way as to induce a reasonable man to believe it, and the representation is meant to be acted on, and he to whom the representation is made, believing it to be true, acts on it and in consequence thereof sustains damage, there is such fraud as will support an action for deceit at law, or a bill for rescission of the transaction in equity. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case, the fraud is constructive; in the other, it is actual.

"One to whom a representation has been made is entitled to rely upon it *quoad* the maker, and need make no further inquiry." *Cerriglio* v. *Pettit,* 113 Va. 533, 75 S. E. 303. See also *Rafferty* v. *Heath, post* p. 195, 78 S. E. 641; *Straud* v. *Griffith,* 97 Fed. 854, 38 C. C. A. 444; 20 Cyc. pp. 60, 62.

The authorities are uniform in holding that whether a plaintiff in such a case relied upon the defendant's representation, or whether he acted in whole or in part upon his own knowledge, is a question for the jury.

An effort is made by the learned counsel for plaintiffs in error in this case to extricate B. D. Tillar from the legal consequences of their deceit in inducing defendant in error to purchase their stock, but we are wholly unable to appreciate the force of the argument in support of this contention. It may be that plaintiff in error, Jordan, was

the more experienced and shrewder of the two engaged in the transaction which resulted in procuring the defendant in error as a purchaser of their stock; still they (brothers-in-law) were participants in and the beneficiaries of the wrongs of which the defendant in error complains, which wrongs could not have been made effectual without the co-operation therein of Tillar with Jordan. From their own testimony they represented to the defendant in error the liabilities of the company as being only about half the actual amount, when they knew well at the time of the existence of other indebtedness which they did not mention. It also very clearly appears from the evidence that the statement of the witness, W. T. Tillar, introduced by plaintiffs in error, in his letter of August 7, 1909, to defendant in error, was an accurate statement of the facts: "I feel like you have been misled and misinformed as to the true condition of this business. Some of the parties who sold you their stock offered to sell me recently and evidently were glad to unload their stock on you."

The judgment of the circuit court is right, and is, therefore, affirmed.

*Affirmed.*