## Richmond

J. W. DeJarnette, T/A, Etc. v. Thomas M. Brooks Lumber Company, Incorporated.

April 26, 1957.

Record No. 4658.

Present, Hudgins, C. J., and Eggleston, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Frank B. Beazley* and *John B. Butzner, Jr.* (*Butzner & Hicks*, on brief), for the appellant.

*Julien J. Mason* and *Walter E. Rogers* (*Mason & Stehl; Williams, Mullen, Pollard & Rogers,* on brief), for the appellee.

WHITTLE, J., delivered the opinion of the court.

J. W. DeJarnette, trading as DeJarnette Lumber Company, filed a bill in chancery against Thomas M. Brooks Lumber Company, Incorporated, seeking an abatement in the purchase price and recovery of loss of profits growing out of alleged misrepresentations with respect to the kind and quantity of standing timber on two tracts of land aggregating 116 acres, purchased by him from the defendant under a timber deed.

Plaintiff alleged four misrepresentations:

1. That the entire tract contained substantially the same character of timber as the portion shown plaintiff;

2. That the one acre tract selected for computing the quantity of timber was typical of the entire boundary;

3. That the tract purchased would produce three million board feet of lumber, whereas in truth it cut "less than two million feet", and

4. That it would cut out at least 95% pine, whereas, it cut "considerably less than 95% pine".

The defendant, answering the bill, denied the allegations generally and asserted that it sold plaintiff the timber as described in the deed exhibited with the bill, under the terms and conditions set forth therein and no other; that there were no false representations made to the plaintiff which induced him to purchase the timber; that the amount or quality of the timber was not guaranteed; that there was a discussion of the timber and an estimate made by all persons present which included the plaintiff, his servants and employees, which covered an area roughly estimated to be an acre; that such area was not represented to be substantially the same as or typical and descriptive of the other acreage; that the plaintiff had every opportunity to go over the land before purchasing the timber; that the tract was not purchased on the day plaintiff viewed the same; that the price agreed upon was not the price first asked but was arrived at after long negotiations; and that the agreement to sell the aforesaid timber was a contract of hazard.

Prior to the trial DeJarnette filed an affidavit requesting the court to order an issue out of chancery, asserting that "to the best of his in-

formation and belief * * * this case will be rendered doubtful by conflicting evidence * * *."

The trial court sustained the motion and entered a decree formulating the issue to be tried before a jury. The formulated issue was: "(W)hether the defendant, * * * through its officers, representatives or agents was guilty of actual or constructive fraud in the procurement of the sale of the timber as alleged in the bill in this cause."

At the conclusion of the evidence the court denied defendant's motion to strike, stating: "I understand that the jury's verdict is advisory, and after the jury's verdict, the court can then decide as to what the court thinks is right in view of the evidence in the case."

The jury held for the plaintiff on the issue presented; whereupon counsel for the defendant moved the court to set aside or disregard the verdict and enter judgment for it on the grounds (a) that the plaintiff conceded at the trial that the only misrepresentations alleged in the bill of complaint upon which he relied concerned the number of board feet of lumber that could be cut from the timber purchased; (b) that statements as to the number of board feet of lumber contained in the 116 acres of standing timber were, as a matter of law, expressions of opinion only, and not such representations as constitute actual or constructive fraud; and (c) that there was no evidence that any misrepresentations constituting actual or constructive fraud were made to the plaintiff by or on behalf of the defendant.

After hearing argument on the motion the chancellor decided that the verdict of the jury should be disregarded on the ground "that statements as to the number of board feet of lumber in the 116 acre tract of standing timber were, as a matter of law, expressions of opinion only and not such representations as constituted actual or constructive fraud", and entered the decree complained of granting judgment for the defendant.

To the entry of this decree plaintiff assigned errors: (1) That the court erred in disregarding and setting aside the verdict for plaintiff found by the jury on the issue out of chancery; and (2) that the court erred in entering final judgment for the defendant.

The first assignment of error is necessarily correlated to the second. We deem it unnecessary to review the many decisions of our court dealing with the weight to be accorded a jury's verdict on an issue out of chancery. Suffice it to say that the general practice is for the chancellor to abide by the findings of the jury upon a properly di-

rected issue but this is not always true. When the chancellor has decided the case himself despite the verdict of the jury and contrary to their findings, on appeal the duty devolves upon the appellate court to examine the evidence and if in its opinion the preponderance thereof is with the verdict the decree will be reversed and final judgment entered in accordance with the verdict. But where the evidence preponderates in support of the judgment of the chancellor his judgment will be upheld. *Fitchette* v. *Cape Charles Bank*, 146 Va. 715, 132 S. E. 688; 7 M. J., Equity, § 151, p. 184.

In this light we consider the evidence as it relates to the assignments of error.

Defendant Brooks Corporation was the owner of a tract of land in James City County, containing approximately 3100 acres, known as Kingsmill. It is conceded that the tract contained substantial quantities of unusually find virgin growth pine and hardwood timber. The Brooks Company was engaged in cutting some of the timber and in selling other portions of it as standing timber. Plaintiff DeJarnette, owner of DeJarnette Lumber Company, lived at Bowling Green in Caroline County. He became interested in purchasing some of the timber and met with Thomas H. Blanton and Thomas M. Brooks, officers of the defendant corporation, both of whom DeJarnette had known for a number of years. This meeting occurred in Bowling Green. DeJarnette testified regarding the first meeting:

"Mr. Blanton called me one morning. I was in my office, just a short way from the bank. He said, 'Joe, would you mind coming over to the bank a few minutes?' I said, 'No, indeed.' I walked over to the bank and went in the directors' room where he was, and there he and Mr. Thomas M. Brooks, of the Brooks Lumber Company, were sitting at the directors' table— * * * and Tom said, 'Joe, Tom Brooks, here, is thinking of subdividing some of the timber acreage down on Kingsmill, a large tract of timber, and I thought you might be interested in it', and said, 'It is beautiful timber. I have seen some of it. I have been down there several times with Mr. Brooks and helped him handle the deal when he purchased it, and I thought you would be interested in it.'

"I said, 'Well, Tom, I could not be interested in any big deal, I don't think. You know my ability to finance things of that nature and I would like to rely on you in that connection.' He said, 'Well, I don't mean all of it, but Mr. Brooks is considering cutting it up into smaller acreage' (tract 5 I believe he referred to it as), and he said,

'He is going to cut that up in acreages, like fifty acres to the tract so the small man can get an opportunity to buy, and he is anxious to move it pretty fast because the price of timber, as we all know, does not remain the same, and Mr. Brooks has considerable money involved in it.'

"I said, 'Tom, I would be interested in it if that is done.' He said, 'Well, some of it is oak and some of it pine', and he said, 'Two tracts, Lots 1 and 2 of Tract 5 that he is proposing, the outer edge of it is 95 per cent pine, and beautiful pine.' I said, 'Well, if it is beautiful pine, I will make an extra effort to try and get some of it.'

"So I talked to Mr. Brooks a few minutes and he said, 'Joe, it is beautiful timber and it will cut 30,000 feet or better to the acre.' I said, 'Tom, I don't know what kind of fancy price you are going to want for that timber.' I said, 'That is something unusual for us, because we only get short lengths of very common pine, the greater part of it, up in our section.' That again, was another reason that I was getting some longer lengths and some good pine to help move the poor pine and the short lengths that we had on the yard.

"So, he said, 'Oh, I reckon about 35 to 37 or 38 dollars a thousand is what it would figure out.' I said, 'Well, I don't think that is too bad, considering what would be the grade and lengths you can cut out of it.' That was roughly, about $10 above the prevailing price in our community. So I said, 'Well, Tom, I will have to think about it.'

"He said, 'Well, I am going to have it surveyed and I am going to the Conservation Commission and see if they will permit me, rather than leaving four trees to the acre, as the law requires—as you all probably know, with pine trees—rather than doing that, that he and Tom Blanton were going down to the Conservation Commission to see if they would permit them to leave a thirty-five-foot strip in and around and between these sections. If they did that, then the acreage would be net in these Lots 1 and 2 and you would get—if it was 50 acres in Lot 1 and 56 or 65 acres in Lot 2, you would get the net acreage and you would not lose four trees to an acre. A hundred acres would be 400 trees you would lose, but this way you would not lose any trees. At that time he had not gotten permission from the Conservation Commission; however, he said 'If I can do that and after I get it resurveyed and marked so as to designate these areas, these thirty-five-foot strips, I will let you know.'

"Well, that was about the end of the conversation at the bank that day."

Plaintiff's account of what transpired at the meeting is in slight error in that he referred to Lots 1 and 2 of Tract 5 as being specifically mentioned. It is apparent that this could not have taken place as the land at that time had not been subdivided.

After Tract 5 was subdivided into lots DeJarnette, Blanton and. Brooks met in Bowling Green a second time. A plat was exhibited indicating Tract 5 had been subdivided into four parcels. DeJarnette's account of what transpired at this meeting follows:

"* * * It was all subdivided into various lots and subdividing Lot 5, I believe it was, into four parcels of land, 50 to 60 acres, and that was the part that he was disposing of when I was talking there. They had this tremendous map there which was very interesting, as I say, and I took a look at it, and Mr. Blanton said, 'Lots 1 and 2 are the ones I have discussed with you, that we have been talking about, that have this beautiful pine timber. Ninety-five per cent of the growth is pine, and I know you would not be interested in the rest of it because it is mostly hardwood. I said, 'No, I am not interested in hardwood. We have all the hardwood locally we want. I am. only interested in good pine to help sell the inferior pine we have on the yard.' He said, 'Well, Lots 1 and 2 contain at least 95 per cent pine and it is beautiful timber.' "

Then followed some general discussion in which plaintiff raised the question as to whether he could finance both Lots 1 and 2 or only Lot 1. He indicated that if the timber was as described he would be interested in both lots. This meeting terminated without any agreement being reached.

The record discloses that DeJarnette, while not an expert timber cruiser, was engaged in the manufacturing end of the lumber business, buying rough lumber from sawmills and manufacturing it into dressed lumber. He had been so engaged for nine years and had made a number of purchases of tracts of timber, some on his own account and in other instances he took title in his own name for the purpose of financing operations for others from whom he was to buy lumber.

On a Sunday in late February, 1951, DeJarnette, accompanied by W. R. Gray, his lumberyard superintendent, and Arlen Reece, a contract timber cutter and experienced timber cruiser, went with Blanton to James City County to meet Brooks and view the timber. There they met Brooks and, after examining the plat of the parcels which made up Tract 5, they drove out to see the timber on Lots 1

and 2 in which DeJarnette was interested and which contained the 116 acres later purchased.

The evidence discloses that when they reached the property they were shown through the woods by Brooks and spent at least two hours cruising back and forth through the timber. The lines separating the tracts were pointed out. These lines were identified by clearly marked 35-foot strips which were required to be left standing in compliance with the pine seed law.

At the trial the witnesses indicated on the plat the approximate route they followed in looking over the timber. The routes thus incated followed the same general course with understandable variations in view of the four years that had elapsed between the inspection and the trial.

DeJarnette and his witnesses were in agreement that they were not hurried in the inspection and that full opportunity was afforded to see any part of the timber they wished. During the course of the inspection Brooks pointed to an area of pine timber and suggested that an "acre" be stepped off and the trees counted in order to estimate the amount of lumber in the standing timber on the "acre". Regarding this DeJarnette testified:

"Well, I would say that we had walked maybe an hour, not more than an hour, and we were not hurrying. * * * (A)nd Mr. Brooks said, 'Boys, how does this acre look to you right here?' He said, 'I think this is a representative, typical acre of these tracts, Lots 1 and 2', and we said, 'Well, it certainly is as far as we have seen,' and he says, 'Well, this is representative, as far as I know, and I have been all over it several times, the entire Lots 1 and 2, the 115 or 116 acres', and he said, 'Well, suppose we step off an acre here and count the trees.' "

Following the counting of the trees, each member of the party made his own estimate. DeJarnette testified that the five estimates varied from 35,000 to 45,000 board feet. The correctness of the estimates on this "acre" was never verified.

After the inspection the parties returned to Brooks' office. The record discloses that Reece was so impressed with the timber and the terrain that he advised DeJarnette that he would cut it for $28 per thousand board feet which was $6 or $7 cheaper than the normal charge for such services. Brooks and DeJarnette then negotiated concerning the purchase price of the timber but no agreement was reached.

Ten days later, in the City of Richmond, the parties came to terms which were embodied in the timber deed dated March 3, 1951. The deed, however, was not executed until March 13, 1951. It conveyed "all of the pine timber measuring 8 inches and over in diameter, including the bark, 8 inches above the ground, and all other timber measuring 14 inches and over in diameter, 14 inches above the ground, standing and growing upon the following described tracts of land." It then mentioned Lot 1, containing 53.76 acres and Lot 2, containing 62 acres, and referred to the plat for a more complete description. There was no sort of warranty in the deed as to the number of board feet of lumber nor as to its character or kind. It merely conveyed to the plaintiff all of the timber on Lots 1 and 2 described therein.

At the trial DeJarnette testified regarding the representations that the timber would cut out 95 per cent pine. He was asked:

"Q. But if there had been 3 million feet there and it had not been 95 per cent pine but had been 80 per cent pine, you would still have been satisfied?

"A. I think I would, yes, sir.

"Q. So, the 3 million feet is what you are squabbling about?

"A. In a way. If I had cut 3 million feet of good stuff out of there, nobody would have heard a word about it.

"Q. Neither is the fact that the area that you went on was typical of the whole area—that would not have made any difference if you had had 3 million feet there?

"A. No, if I had gotten the footage that was represented there."

Apparently the allegation that defendant's agents represented that the tract would cut 95 per cent pine was either thus abandoned or substantially modified. Clearly, it would not take a timber expert to distinguish pine trees from oak.

In testifying as to Brooks' estimate of the board feet on the tract, DeJarnette was asked:

"Q. Did he make any guarantee to you that there was three million feet?

"A. No guarantee, no, sir.

"Q. He was speaking to you his opinion of what it would cut; is that right?

"A. Well, he was representing it to be three million or three million and a half feet on the 115 acres, and that is how I arrived at a

price to offer him and that is how I figured he arrived at a selling price.

* * * * * * *

"Q. Do you know enough about cruising timber to know it is not an exact science?

"A. Yes, sir, I know that.

"Q. And that no two people would go in a piece of timber and cruise it exactly the same; you know that, don't you?

"A. I think that is right, yes, sir.

"Q. And that no one knows what a piece of timber is going to cut out until the last board foot is cut? You know that, don't you?

"A. Oh, yes. I think we know that, all of us.

"Q. So, anybody that makes a statement on board feet is hazarding a guess or opinion on his part, is he not, sir?

"A. To a certain extent, I would say, but, like other occupations, I think some people are better qualified to do it than others.

"Q. Some people are qualified to give a better opinion?

"A. Or a better estimate."

The testimony of Brooks is consistent with that of DeJarnette. He contended throughout the trial that any statements as to the board feet of lumber on the parcels represented merely his best estimate. He testified:

"Q. Did you make any estimate as to the amount of timber on the two tracts?

"A. Mr. DeJarnette asked me how much timber I figured that I had there on the two tracts and I gave him my estimate on it.

"Q. What did you estimate it?

"A. I estimated the two tracts would cut three million feet, that is, one and two.

"Q. What was that based on, Mr. Brooks?

"A. My general line of cruising—method of cruising, I will say.

* * *

"* * * (Y)ou haven't got any chance to better the man cruising timber, who is right or wrong, because either one could be wrong. There is no human way of measuring the amount of timber in a woods until it is cut into lumber."

It is not necessary for us to decide whether the court correctly ordered the issue out of chancery at the request of DeJarnette. In

this instance the court correctly stated, upon defendant's motion to strike the evidence: "I understand that the jury's verdict is advisory, and after the jury's verdict, the court can then decide what the court thinks is right in view of the evidence in the case." In the final analysis, when acting upon a jury's verdict on an issue out of chancery, the responsibility of the decision rests upon the chancellor, the issue being ancillary to his decision, and his conscience must be satisfied as to the correctness of the verdict before he can proceed to base his decision thereon.

We interpret the challenged phrase, "as a matter of law", used by the chancellor in his opinion and decree, to mean that it was a matter of law under the evidence in this case. It is clear the decree properly decided "that statements as to the number of board feet of lumber in the 116 acre tract of standing timber were * * * expressions of opinion only and not such representations as constituted actual or constructive fraud."

It is clear from a reading of the evidence that the only alleged misrepresentation material to DeJarnette and claimed to have been relied upon by him was the statement by Brooks that the tracts of timber would cut at least three million board feet. Brooks readily conceded that he gave the plaintiff this estimate.

Nowhere is it claimed in the pleadings nor shown by the proof that Brooks did not accord DeJarnette full opportunity to make his own independent inspection before the timber deed was signed. The case presents the usual situation where the seller was endeavoring to get the best price he could for his property and the buyer was attempting to purchase as cheaply as possible.

The evidence shows that from what DeJarnette saw on the ground he was enthusiastic about the timber. At one point in his testimony he said, "I was interested in the trees because I had never been in a pine woods that had as many trees as close together and as large and as tall * * * just beautiful pine * * *." Reece, DeJarnette's timber cutter and an experienced timberman, stated that he had never seen timber as good either before or since, and that he so told DeJarnette and his lumberyard superintendent. These appraisals were made from what these men saw on the ground, uninfluenced by any representations.

The burden was on DeJarnette to prove by clear, cogent and convincing evidence that the officers, agents or employees of the defendant corporation made a misrepresentation of a material fact as

distinguished from an expression of opinion. Such representation must have been made for the purpose of inducing the sale and must have been relied upon by DeJarnette to his detriment.

In *Elam* v. *Ford* (1926), 145 Va. 536, 546, 134 S. E. 670, we said:

"A misrepresentation which will avoid a deed or contract for the sale of real estate must be a statement of a fact, and not merely an opinion. It must have been made for the purpose of inducing the deed or contract, and relied upon as a fact by the party complaining and must have been material and untrue." See also *Jordan* v. *Walker*, (1913), 115 Va. 109, 78 S. E. 643; *Hicks* v. *Wynn* (1923), 137 Va. 186, 119 S. E. 133; *Henning* v. *Kyle* (1949), 190 Va. 247, 56 S. E. 2d. 67.

"It is regarded as fundamental that fraud cannot be predicated upon what amounts to a mere expression of an opinion." *Poe* v. *Voss* (1955), 196 Va. 821, 825, 86 S. E. 2d 47, 49.

In his testimony DeJarnette concedes that the cruising of timber is not an exact science and that anyone making an estimate as to the number of board feet in a tract of timber is hazarding a guess and expressing an opinion. This admission by DeJarnette is confirmed throughout the record by the other witnesses and is clearly illustrated by DeJarnette's testimony that the estimates by the five witnesses as to the number of board feet of lumber which could be cut from the "acre" varied from 35,000 to 45,000 board feet.

It will be remembered that DeJarnette did not accept the representations made to him by Brooks and Blanton at Bowling Green, but on the contrary he, together with his lumberyard superintendent and his timber cutter who was an experienced timber cruiser, traveled from Bowling Green to James City County to inspect the timber first hand, and it is agreed throughout the record that every opportunity was afforded them to look over any part of the timber they desired and to make their own independent appraisal thereof. DeJarnette apparently did not choose to have a complete and independent cruise made although he had ample time and opportunity to do so. Instead, he was content to rely upon what he considered "looking at the timber generally".

The case of *Wren* v. *Moncure*, 95 Va. 369, 28 S. E. 588, was a suit to rescind an agreement to purchase land on the ground of fraudulent representations that the land was suitable for building purposes while the proof showed that about half of it was broken, rough and gullied. There we said:

"The representation made in this case by the vendors, as established by the testimony, being simply the expression of opinion and not the representation of a material fact, it constitutes no ground for the rescission of the contract. The vendees were not entitled to rely on it and omit to make the inquiries and examination which a prudent man ought to make, for the law does not hold one responsible for words of commendation of his property, unless the parties deal on unequal terms, and one has means of information that are not equally open to the other, or he has used means or practiced some artifice to prevent the other from making inquiry or examining the property. *Grim* v. *Byrd, supra* (32 Gratt. 300); *Lake* v. *Tyree, supra* (90 Va. 719); *Parker* v. *Moulton*, 114 Mass. 99; *Gordon* v. *Butler*, 105 U. S. 553; and Wald's Pollock on Contracts, 523-4, and cases cited in note.

"The land in question was equally open to the examination of the purchasers as of the owners, and the evidence fails to disclose that the latter used any means or resorted to any artifice to avert inquiry, or to prevent the former from examining the land. On the contrary, there is an entire absence of evidence of any purpose or desire on the part of the owners to conceal from the purchasers the character of the land. All were earnestly invited before the contract of sale was executed to visit and inspect the property, and those who came were freely driven through it, without giving utterance to any dissatisfaction or expressing a wish to examine it more particularly. If the purchasers neglected to make such inquiry or examination, at or before the execution of the contract of sale, as ordinary prudence would dictate, they cannot found, upon the mere expression of an opinion by the owners or their agents that the land was available for building purposes, the right to have the contract rescinded more than two years thereafter by a court of equity." (95 Va., at pp. 373, 374)

In *Lake* v. *Tyree*, 90 Va. 719, 19 S. E. 787, we said:

" 'The common law', says Chancellor Kent, 'affords to every one reasonable protection against fraud in dealing, but does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information.' 2 Kent. Comm. 485.

"This pithy statement of the law was quoted with approval in *Smith* v. *Richards*, 13 Pet., 26; and in the subsequent case of *Slaughter* v. *Gerson*, 13 Wall., 379, it was laid down as the established doctrine, in conformity with the authorities already cited, that where the means of knowledge are at hand and equally available to both parties,

and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities, he will not be heard to say that he has been deceived by the vendor's misrepresentations; that if, having eyes, he will not see matters directly before them, where no concealment is made or attempted, he will not be entitled to favorable consideration when he complains that he has suffered from his own voluntary blindness, and been misled by over-confidence in the statements of another." (90 Va., at pp. 724, 725)

The uncontradicted facts establish that DeJarnette either undertook and made a full and independent investigation and inquiry and acted upon the information so obtained, or made a partial inquiry, with full opportunity of complete investigation and ascertainment of all the facts, and then elected, not to exhaust the readily available sources of information, but to act upon the knowledge obtained from his partial inquiry. In *Masche* v. *Nichols*, 188 Va. 857, 868, 51 S. E. 2d 144, 148, it was said:

"In either of the latter instances, if he in fact acts upon the information so secured by himself, he will not be heard to say that he relied upon the previous misrepresentation of fact."

We see no error in the result reached, and the decree is

*Affirmed.*