# CHARLESTON.

## L. A. STAKER v. L. R. REESE.

Submitted September 17, 1918.   Decided September 24, 1918.

1. CORPORATIONS—*Fraud—Action for Damages.*
   Where the managing officer of a corporation, with full knowledge that a sale of the assets thereof is about to be consummated, approaches one of the stockholders who is also a director of such corporation, for the purpose of purchasing his stock, and upon inquiry informs such owner that there are no such negotiations pending or contemplated, and relying upon this statement, and in ignorance of such contemplated sale of the corporate assets, the owner of the stock parts therewith for a sum grossly less than its actual value as measured by the price at which such assets are being sold, the purchaser is guilty of fraud and deceit which will sustain a civil action for the recovery of damages.   (p. 774).

2. FRAUD—*Misrepresentation—Reliance Thereon.*
   One to whom a representation has been made as an inducement to enter into a contract has the right to rely upon it as true *quoad* the maker, without making inquiry or investigation to determine the truth thereof.   (p. 774).

3. SAME—*Fraudulent Representations—Measure of Damages.*
   Where one is induced to make a sale of his property for an inadequate price by false and fraudulent representations of the purchaser, the measure of his damages for such fraud and deceit is the difference between the amount received by him for the property and the actual value thereof at the time.   (p. 776).

4. CORPORATIONS—*Fraud—Measure of Damages.*
   Where a director, who is the managing officer of a corporation, with full knowledge that negotiations are pending for a sale of the assets of such corporation which are reasonably certain of consummation, for the purpose of securing the stock of another di-

rector, represents to him that there are no such negotiations pending or contemplated, and in reliance upon which, and without knowledge of such contemplated sale of the corporate assets, such other stockholder sells his stock for an amount materially less than it is worth, should the sale of the corporate property in contemplation be made, and such corporate assets as a result of the then pending negotiations are sold, the measure of damages to which the defrauded stockholder is entitled is the difference between what he received for his stock and what he would have received therefor as a participant in the distribution of the sale of the corporate assets, had he retained said stock.  (p. 776).

5.  TRIAL—*Instructions—Repetition.*
  Where the jury has been fully instructed upon a pertinent proposition of law, it is not error to refuse other instructions propounding the same legal principle.  (p. 776).

Error to Circuit Court, Cabell County.

Action by L. A. Staker against L. R. Reese.  Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*Holt, Duncan & Holt* and *Campbell, Brown & Davis,* for plaintiff in error.

*Simms & Staker,* for defendant in error.

RITZ, JUDGE:

This suit was instituted for the purpose of recovering damages for the alleged fraud and deceit of the defendant in the purchase from the plaintiff of certain shares of stock of the New Rex Coal & Coke Company.  Both of these parties were stockholders and directors of that company.  The defendant was also the president thereof, and as such president he was the managing officer of the company, controlled its destinies, and was in full charge of its fiscal affairs.  The plaintiff owned forty-nine shares of stock, together with certain shares of stock in another coal company, which, on the 15th day of March, 1917, he transferred to the defendant, receiving ninety-five hundred dollars for the New Rex Coal & Coke Company stock, and fifty-five hundred dollars for his stock in the other company.  The only thing involved in this litigation is the stock of the New Rex Coal & Coke Company.  The

plaintiff contends that a few days before he made this transfer he was approached by the defendant with the inquiry as to whether or not he desired to sell this stock; that he informed the defendant that he was perfectly satisfied with the company, and with the defendant's management of it; that he had perfect confidence in the defendant, and that he did not care to sell his stock; and inquired why the defendant made the inquiry. The defendant informed him, so he says, that he, the defendant, thought plaintiff might be dissatisfied with the stock, and might desire to sell it on account of a loss the company had sustained of fifteen or twenty thousand dollars, and that he further informed the plaintiff that the company was hampered in its business by embargoes on coal shipments, and by car shortages, and generally depreciated the value of the company's stock. Notwithstanding this the plaintiff still expressed his satisfaction with the company's affairs, and his confidence in the defendant's management. A day or two later the plaintiff says that the defendant again approached him on the subject of buying his stock, and told him that he wanted to get it so that he could control the affairs of the company; that some of the stockholders were getting dissatisfied, and he wanted to be in position to control the company so that they could not put him out. Plaintiff says that he expressed surprise that the defendant would desire to purchase his stock, inasmuch as they had always been close friends, the plaintiff had always relied on the defendant, and defendant had always expressed the greatest confidence in the plaintiff, and inquired why he did not attempt to purchase the stock of some of the other stockholders who were not so well satisfied, and also inquired of the defendant if there were any negotiations on for the sale of the company's property which might affect the value of the stock, informing the defendant that he had heard of cases where people had entered into negotiations for the sale of properties of this kind at a good price, and then purchased the stock from the holders thereof without their knowledge of such negotiations, and he states that the defendant assured him that there were no such negotiations pending or contemplated. About this time it appears that the plaintiff contemplated moving his

office from the building in which it was located to the same
building in which the defendant had his office. The plaintiff
and his partner desired three rooms for the purpose of their
offices, and the superintendent of the building showed them
three rooms such as they desired, one of which was occupied
by the defendant. The plaintiff suggested that the defend-
ant would be willing to move into another room so that he
might get the three connecting rooms, believing that on ac-
count of their close association this would be perfectly satis-
factory with the defendant; that a day or two after this time
the defendant called the plaintiff over the telephone, and
asked him to come to his office. In response to this invita-
tion plaintiff says that he went to the office of the defendant,
who then charged him with trying to get an office in close
proximity to him so that he could spy on the business of the
company, with having no confidence in his management, and
having circulated among the stockholders false reports in
an attempt to get them dissatisfied with his management of
the company, in order to put him out, and asserted that one
or the other of them would have to get out of the company;
stating that he would either sell his stock or buy the plain-
tiff's. Plaintiff says that he remonstrated that he had not
attempted·to purchase any stock, that he had not circulated
among the stockholders any report to get them dissatisfied;
in fact, had thought of no such thing. After some further
conference the defendant insisted on his making a proposi-
tion. He states that he made the defendant a proposition to
take fifteen thousand dollars for his stock in the two com-
panies, ninety-five hundred dollars for his New Rex Coal &
Coke Company stock, and fifty-five hundred dollars for his
stock in the other company. That in making this proposi-
tion he relied upon all of the statements that the defendant
had theretofore made to him in regard to the condition of
the company's affairs, and particularly did he rely upon the
defendant's statements that there were no negotiations pend-
ing for the sale of the company's property; that he thought
ninety-five hundred dollars for this stock was a good price,
basing his opinion upon this information. That the defend-
ant accepted this proposition and told him to go and get his

stock certificates; that he went and got them and returned in a very short time and transferred them to the defendant, and the defendant gave him two checks covering the amount of the purchase price.  A few days afterward the company's assets were sold for the sum of three hundred and twenty-five thousand dollars, more than four hundred dollars a share, twenty-five thousand dollars of which, however, was paid to the broker as compensation for making the sale, leaving three hundred thousand dollars net to the company. The plaintiff upon learning of this sale, so advantageous to the stockholders, inquired of the defendant if he had told him the truth when he represented to him at the time he purchased his stock that there were no negotiations pending for the sale of the company's property, and he insists that the defendant reiterated the statement that he had told him the entire truth in that regard, that at that time no negotiations were pending, and that the negotiations which resulted in the sale were begun only a day or two before the sale was actually consummated.  The defendant denies practically all of the statements made by the plaintiff, at least so far as they are in any wise material in the case.  He denies that he ever made any statements to the plaintiff as to the condition of the company; he denies that he ever stated to him that there were no negotiations pending for the sale of the company's property; he denies that he ever approached the plaintiff for the purpose of buying plaintiff's stock, but insists that the plaintiff approached him and insisted upon selling his stock, and it was only upon the repeated requests of the plaintiff, and because the plaintiff was creating dissatisfaction among the other stockholders, that he agreed to purchase it for a sum largely in excess of its real value.  It is a little strange that while he charges the plaintiff with creating discord in the company, he does not introduce a single stockholder to support this contention.  The broker who made the sale of this property testifies that in the latter part of the month of February he began negotiations with the defendant with a view to selling the property of the New Rex Coal & Coke Company; that he had a client desirous of purchasing a coal property, and he approached the defendant asking at

what price this property could be procured; that defendant told him the property could be procured for three hundred thousand dollars, and that anything he could get in excess of that he might have for his compensation; that the defendant at that time would not put this statement in writing, but that on the 5th of March the defendant did write him a letter in which he authorized him to make sale of the property for three hundred thousand dollars, anything in excess of that, not to exceed fifteen thousand dollars, to be retained by him as compensation for making the sale; that immediately upon the receipt of this letter he got in communication with his partner who interested their client in the property. Two experienced mining engineers were sent upon the property to make an investigation. On the 14th of March one of these engineers made his investigation and his report was entirely favorable. The other engineer was expected to arrive on the 15th. This broker testified that he communicated almost daily with the defendant the progress being made in the negotiations; that Reese knew that on the 14th of March one of the engineers made his investigation on that day, and that his report would be favorable; that on that day he had a conversation with Reese in which he told him that the other engineer would be there on the next day, or on the 16th, but that it would be impossible to get these reports in and have them considered by the 15th, the time limited for the sale in the writing which had been given on the 5th; that Reese then verbally extended the authority to sell for a few days, and at the same time told him that they must act quickly, inasmuch as he had another purchaser who had the cash and wanted the property. He communicated this to his client. That the other engineer went upon the property on the 16th or 17th and made an investigation and inspection of it and informed the broker that his report would be entirely favorable. All of this information was communicated to Reese. On the 15th of March, according to this broker's testimony, Reese knew that one of the engineers who had been sent to investigate this property had inspected it, and that he would make a favorable report upon it. From the communications as shown by the broker, made almost daily to Reese, he was

practically assured that if the mining engineers reported favorably the property would be taken. The engineers did report favorably; the general manager of the purchasing company came upon the ground and closed the purchase about the 27th of March for three hundred and twenty-five thousand dollars, twenty-five thousand dollars, under a modification of the arrangement, being retained by the broker, and three hundred thousand dollars being turned over to the company. Reese admits that he wrote the letter to the broker authorizing him to sell the property, but he states that he had no confidence in the broker's ability to do it; so little confidence did he have that he never thought anything more about it, and at the time he bought the stock from the plaintiff that it had entirely passed out of his mind. He says that he never had another conference with this broker until the 17th of March after he had purchased the Staker stock, notwithstanding the broker testifies that he was in almost daily communication with Reese from the 5th of March until the sale was finally consummated. Reese also claimed to another witness and stockholder of the company that the negotiations which culminated in the sale were begun only a day or two before the sale was actually made. The jury found a verdict in favor of the plaintiff for the difference between the amount which Reese had paid him for the stock and the amount which Reese got for it in the division of the company's assets, and this writ of error is prosecuted to reverse that judgment.

The defendant contends that the court should have directed a verdict for the defendant; that even if all the testimony of Staker and the broker who made the sale of the property is true, there is no cause of action against him. We cannot agree with this conclusion. It is true, perhaps, that at the time of the purchase of the Staker stock the negotiations for the sale of the property were not so far consummated as that either of the parties could have enforced a performance upon the part of the other, but this is not at all material when we consider that both parties actually did perform a few days thereafter.

The defendant earnestly contends, however, that the court

misdirected the jury.  He contends first that, inasmuch as
both of the parties to this suit were directors in the New Rex
Coal & Coke Company, neither was under obligation to the
other to disclose any information he might have in regard
to the company's affairs, and that the court refused to in-
struct the jury to this effect upon his motion; and second,
he contends that the court improperly instructed the jury
as to the measure of plaintiff's damages.  The court on mo-
tion of the plaintiff gave to the jury the following instruc-
tion:  ''The Court instructs the ᵥjury that a director or
managing officer of a corporation having a knowledge of the
true condition of affairs of such corporation, or any exclusive
information affecting the value of the stock of such corpora-
tion, because of the trust relation and the superior opportuni-
ties afforded for acquiring information, before he can right-
fully purchase the stock of one not actively engaged in the
management of its affairs, and who is without the exclusive
information possessed by the former, must inform such stock-
holder of everything peculiarly and exclusively within his
knowledge which would affect the value of the stock.  And
the Court further instructs the jury that if such director or
managing officer undertakes to speak or become active in
inducing the sale, he must speak fully, frankly and honestly,
and conceal nothing to the disadvantage of the selling stock-
holder,'' and refused to give to the jury three instructions
offered by the defendant as follows:  ''The Court instructs
the jury that the defendant, Reese, was under no duty under
the law to disclose to the plaintiff, Staker, before he purchased
his stock, any information, in the possession of said Reese
concerning New Rex Coal & Coke Company, its property or
financial condition, or its plans and purposes for the future,
or other information affecting the value of stock in such cor-
poration; and unless the jury believe from the evidence in
this case that the defendant, Reese, before he purchased the
stock of said Staker, did undertake to give to said Staker,
either in answer to questions of said Staker or voluntarily,
information affecting the value of stock in said corporation,
they must find for the defendant.''  ''The Court further in-
structs the jury that if they believe from the evidence in this

case that at the time the plaintiff, L. A. Staker, sold the stock mentioned in the evidence to L. R. Reese both the plaintiff and the defendant were directors of New Rex Coal & Coke Company, then the defendant, L. R. Reese, did not, under the law, occupy any confidential or trust relationship to the plaintiff, L. A. Staker, which would require the said L. R. Reese to voluntarily disclose to the said L. A. Staker any knowledge which the said L. R. Reese might have concerning the affairs of said New Rex Coal & Coke Company.'' ''The Court instructs the jury that before the defendant will be liable in this case upon the ground that said defendant withheld from the plaintiff information concerning a sale of the property of the New Rex Coal & Coke Company, the jury must believe from the evidence in this case that on March 15th, 1917, when the defendant purchased the stock of the plaintiff, the defendant knew that a sale of the property of said New Rex Coal & Coke Company had been practically consummated.

And the jury must further believe from the evidence that the said L. R. Reese, before he bought said stock, undertook to give to the plaintiff, Staker, information concerning said New Rex Coal & Coke Company, its property, or financial condition, or its plans and purposes for the future, or other information affecting the value of stock in said corporation, and that the said L. R. Reese designedly withheld such information as to such sale, from the plaintiff, L. A. Staker; and the plaintiff would not even then be entitled to recover, if the jury further finds from the evidence that the said L. A. Staker was then a director of said New Rex Coal & Coke Company, and that by virtue of his position, and by the exercise of due diligence, he could have learned the facts with reference to such sale by an inspection of the papers and correspondence of the Company.'' And he insists that the giving of the instruction above quoted and the refusal to give the above instructions asked by him was to hold that the defendant was under obligation to inform the plaintiff as to all the knowledge he had of the company's affairs before making the purchase of plaintiff's stock. If this was all that the court said on this question there might be something in

the defendant's contention, but we find upon an examination of the record that the court gave to the jury, on motion of the defendant, certain instructions fully covering this theory of the defendant. Instructions Nos. 4, 6, 9 and 11 given on motion of the defendant are as follows: "The Court further instructs the jury that before the defendant will be liable in this case upon the ground that said defendant withheld from the plaintiff information concerning a sale of the property of the New Rex Coal & Coke Company, the jury must believe from the evidence in this case that on March 15th, 1917, when the defendant purchased the stock of the plaintiff, the defendant knew that a sale of the property of said New Rex Coal & Coke Company was pending. And the jury must further believe from the evidence that the said L. R. Reese, before he bought said stock, undertook to give to the plaintiff, Staker, information concerning said New Rex Coal & Coke Company, its property, or financial condition, or its plans and purposes for the future, or other information affecting the value of stock in said corporation, and that the said L. R. Reese withheld such information as to such sale from the plaintiff, L. A. Staker." "The Court further instructs the jury that before the plaintiff can recover in this case, he must prove by a preponderance of the evidence that the defendant, L. R. Reese, before he purchased the stock of the plaintiff, undertook to inform the plaintiff, Staker, concerning New Rex Coal & Coke Company, its property or financial condition, or its plans or purposes for the future, or undertook to give to said L. A. Staker other information affecting the value of stock in such corporation, and that the said Reese, having undertaken to give such information, designedly made misstatements of fact or withheld information known to him, affecting the value of shares of stock in the said corporation, and that the said Staker sold the stock relying upon such misrepresentations, or without knowledge of the facts so withheld." "The Court further instructs the jury that although they may believe from the evidence in this case that the defendant at the time he purchased the stock of the plaintiff did not disclose to the plaintiff that there was pending a sale of the property of New Rex Coal & Coke Company, yet

if they further believe from the evidence in this case that the plaintiff was at the time a director in said Company, and could by the exercise of due diligence have informed himself as to the value of the stock, they must find for the defendant.'' ''The Court further instructs the jury that if they believe from the evidence in this case that at the time the defendant, L. R. Reese, purchased from the plaintiff L. A. Staker, the stock mentioned in the evidence in this case the said L. A. Staker was a director in New Rex Coal & Coke Company, the said L. A. Staker cannot recover in this case upon the ground that he was ignorant of any fact which would have been disclosed to him by an investigation of the property, books, correspondence and papers of said corporation, even though the jury may believe from the evidence that the said L. A. Staker had at the time of the sale made no such investigation and had no knowledge of such facts.'' These instructions read together fully and clearly inform the jury as to the court's view of the case, and it only remains for us to inquire what was that view, and is it a correct one? These instructions clearly tell the jury that there is a duty upon a director of a corporation who has peculiar and exclusive knowledge of something affecting the value of the company's stock, before purchasing the stock of another, to convey such information to such other, yet his failure to communicate such information does not create a cause of action for damages in case he purchases the stock for less than its value, unless he undertook to inform the party from whom he purchased as to the condition of the company's affairs, in which case he must inform him fully, or unless he falsely and fraudulently represents to him material matters which affect the value of the stock upon which the seller relies, and even though he does this the plaintiff would not be entitled to recover if the matters so falsely and fraudulently communicated to the plaintiff by the defendant were of that character which the plaintiff could have found out from an inspection and examination of the books, records and correspondence of the company. There is no question here of a civil liability arising because of an implied obligation upon the part of one director to communicate facts in regard to the company's

business to another from whom he proposes to purchase stock.
On the contrary, there is a positive declaration by the court
that no recovery can be had unless there are false and fraud-
ulent representations made, or else an attempt upon the part,
of the plaintiff to inform the defendant of the company's
affairs, and a withholding by him of material facts. We
think the instructions are more favorable to the defendant
than he was entitled to, in that the court required the plain-
tiff to satisfy the jury that the matters about which the fraud-
ulent representations were made were such as could not be
discovered by an inspection of the books and records of the
company. It was equivalent to saying to the jury, even
though you believe that the defendant falsely and fraudu-
lently represented to the plaintiff material facts in regard
to the value of his stock, in reliance upon which the plaintiff
made sale thereof, he cannot recover unless these facts were
such as could not have been found out by an examination
of the books and records of the company. There is no such
rule of law as this. If the jury believed in this case that the
defendant made the false and fraudulent representations
charged, or denied that negotiations were pending for the
sale of the company's property when he was asked in regard
thereto, then the plaintiff could rely upon those statements;
and as between these parties the defendant will not be al-
lowed to say: "It is true I falsely and fraudulently represent-
ed facts to you; I deceived you when you asked me whether
there were any arrangements pending for the sale of the
properties of this company, but you should not have believed
what I said; you should have made other investigation; you
should have taken notice that I was liable to defraud you."
The law does not countenance such conduct as this, but it is
rather the policy of the law to encourage mutual confidence
and trust among business associates. *Engeman* v. *Taylor,* 46
W. Va. 669; *Cerriglio* v. *Peltit,* 113 Va. 533; *Jordan* v.
*Walker,* 115 Va. 109; *Halsell* v. *First National Bank of Mus-
kogee,* L. R. A. 1916 B, 697 and note; 20 Cyc. 62. We are
clearly of the opinion that the defendant has no reason to
complain of the instructions of the court in this regard. A
heavier burden was placed upon the plaintiff than the court

should have imposed, but the jury found in his favor notwithstanding this, and of course he is not now complaining, and the defendant cannot.

The defendant argues that there is no implied obligation upon directors to communicate to each other knowledge that they may have in regard to the company's affairs. Whether or not this is so we need not inquire, for the reason that the court below recognized such to be the law, and by its instructions fully conformed to the defendant's view. It is true the court rejected some instructions offered by the defendant presenting this view, but he was under no obligation to keep on telling the jury the same thing as often as the defendant wanted to propose it; in fact the trial court should not emphasize by repetition a proposition of law controlling in the case. The instruction which the court did give on this question was concrete; it had application to the particular facts which had been brought out in the case, and was very much more enlightening to the jury than any of the instructions which were refused.

The defendant further contends that the court erred in instructing the jury upon the measure of damages. The court instructed the jury upon this question that if they found the plaintiff was entitled to recover, then the measure of damages would be the difference between what Staker received for this stock from Reese and the amount that Reese received for it, and refused to give to the jury an instruction offered by the defendant that the measure of damages was the difference between the amount paid for the stock and the market value thereof. The rule for measuring damages in such cases as this, as in fact it is in all cases where compensatory damages are sought, is that the party injured should be made whole. The law does not contemplate that one who procures a bargain by fraud shall benefit thereby, but that one who has been defrauded of his property shall be compensated by the party who defrauds him to the extent of complete satisfaction. In other words, he is entitled to recover in a case like this, where the property is stock in a corporation which has been wound up, what he would have received had not his stock fraudulently been taken from him. We must

bear in mind that the court told the jury before the plaintiff could recover at all there must have been a sale of the corporate assets of the New Rex Coal & Coke Company in process of making at the time the defendant purchased plaintiff's stock, which sale was subsequently consummated, and that if they did believe that there was a sale made pursuant to the negotiations being had at the time of the purchase of plaintiff's stock, then the plaintiff would be entitled to receive, in addition to the amount paid him, such a sum as added to this amount would make what the defendant actually received for the stock as a result of that sale. The rule for measurement of damages in a case like this is stated in 20 Cyc, p. 137, as follows: "The general rule, in cases of fraud or deceit, is that defendant is responsible for those results, injurious to plaintiff, which must be presumed to have been within his contemplation at the time of the commission of the fraud, and plaintiff may recover damages for any injury which is the direct and natural consequence of his acting on the faith of defendant's representations." A like rule is laid down in 8 R. C. L., p. 434. See also Sedgwick on Damages, §439a. Sutherland on Damages, at p. 4414, lays down the rule for the determination of damages in this character of case as follows: "Where the plaintiff was induced by deceit to sell stock to a person who had secured the majority of the stock of the corporation which issued it and who was willing to buy all the remaining stock outstanding, and who did in fact buy all such stock at prices higher than the plaintiff, by reason of the deceitful representations of the defendant, was induced to sell for, the damages were measurable by the value of the chance to sell the stock; such damages were proximate in the sense that they were such as the wrongdoer must have contemplated as the probable consequence of his misconduct, and certain in the sense that they were not problematical." In the case of *Matthews* v. *Bliss,* 22 Pickering, 48, the Supreme Judicial Court of Massachusetts, through Mr. Chief Justice Shaw, in discussing the proper measure of damages under circumstances very similar to the case made here, at page 54 of the opinion says: "So, upon the question of damages, the actual price, at which the defendants sold the ves-

sel, especially if they received the money, would be by far the most satisfactory evidence of value, and that which the jury would probably adopt, but not conclusive. It may be, that the price named was a barter price, or that the sale was made on bad security, and the money never realized, or that something besides the mere money value of the vessel, entered into the contract of sale. If there were no such circumstances, the price which the defendants actually obtained, would seem to be the proper measure of damages, not only because it would be unjust to permit a fraudulent party to retain the fruits of his fraud, but because, if the plaintiff's agent had not been induced to sell to the defendants at the under price, those who stood ready to purchase, would have come to him and offered the larger price, which they were ready to give to the defendants." The conclusion reached by the learned Chief Justice in that case is, that where there are no uncertain elements, such as probable insolvency of the purchaser, then the price at which one sells property which he fraudulently procures is the proper measure of damages. Why should the defendant be allowed to profit by his own fraud, assuming that the market price was less than the price which he received, of which there is no evidence, however, in this case? We must look at this transaction from his standpoint, and with the information before us that he possessed at that time, as found by the jury in this case, that is that there was a sale pending, which the defendant knew in all likelihood would be consummated, which would make the value of this stock more than four hundred dollars a share, and that by his fraudulent representations the plaintiff was deprived of the opportunity of participating in that sale. See also *Weaver* v. *Kohn,* 12 Pa. Sup. Ct. 143. What is the market value of a commodity? The answer is, what it will bring in the market. What is the best evidence of its market value? The answer must be what it actually sells for, so that we may say that even if the jury had been instructed that the proper measure of damages was the difference between the price paid and the market value of the stock, the only verdict they could have found would have been that the market value was approximately four hundred dollars a share,

which would have been more to the defendant's disadvantage than the present verdict. Upon this question of the measure of damages the defendant cites a number of authorities which he contends support his position that the court's instructions were wrong. We have carefully examined every one of them, and we do not find that a single one has application to a case like this. They are all cases in which damages were sought on account of false and fraudulent representations made by the seller of different classes of property, and the defrauded party insisted that he was entitled to recover the difference between what the property would be worth, if it was as represented, and what it actually was worth, while the court held that what he was entitled to recover was what he paid for the property less its actual value; that it was not the policy of the law to do any more than make him whole, to give him back the money that he paid, but if he kept the property which was sold to him he must credit the amount paid by him with the value of the property. This is exactly what we are holding in this case, that it is the actual value of the thing the defendant got which fixes the measure of his liability, not any speculative value, but what it actually brought to him in money. That is the holding of all those cases.

We find no error in the judgment complained of, and the same is affirmed.

*Affirmed.*