Maud Meadows, *et al.*

*v.*

Bradshaw-Diehl Company, A Corp., *et als.*

(No. 10555)

Submitted February 3, 1954.    Decided March 23, 1954.

L. E. Woods, Jr., C. F. Bagley, for appellants.

E. Garland Ray, George S. Wallace, George S. Wallace, Jr., for appellees.

LOVINS, JUDGE:

This suit brought in the Circuit Court of Cabell County, West Virginia, presents one controlling question: Whether the directors of the corporate defendant are guilty of actual or constructive fraud to the detriment of the two groups of plaintiffs who were holders of the second preferred stock in the corporation. The suit was brought by Maude Meadows, Mildred Bryant and Frances Hines on behalf of themselves and all other stockholders of the Bradshaw-Diehl Company, similarly situated, against Bradshaw-Diehl Company, a corporation, Glenn E. Fargo, George D. Bradshaw, Henry T. Diehl, Vincent N. Diehl, Selden S. McNeer and Helen Fargo.

After the suit was brought, W. A. Bibb, L. S. Bibb and Clara May Bibb filed a petition, the effect of which was to permit them to intervene in the original suit. They adopted the allegations of the original bill of complaint and joined in the special prayers contained in the bill filed by the original plaintiffs. The original plaintiffs will be hereinafter designated as the Meadows group, the interveners as the Bibb group, the Board of Directors as the Board, except where it is necessary to refer to a particular member of such Board and Bradshaw-Diehl as Corporation.

In 1930 and prior thereto, the corporation was in financial difficulties. It owed considerable debts for money borrowed and merchandise purchased. It seems to have been under the management of George D. Bradshaw and H. T. Diehl who were members of the Board at the time of the institution of this suit.

The Corporation owed The First Huntington National Bank and the Ohio Valley Bank money in excess of $120,000.00.

A reorganization of the corporation was effected by agreement bearing date the 28th day of February, 1930. By that agreement, it was provided in substance that the capital structure of the corporation should be changed and that thereafter, the capital stock would consist of

1000 shares of 6% cumulative first preferred stock of the par value of $100.00 each, approximately 1219 shares of second preferred stock of the corporation and approximately 610.5 shares of the no par common stock.

In accordance with the agreement, the 1000 shares of the first preferred stock was to have preference over any other stock as to payment of dividends and distribution of assets in event of liquidation; that the holders of such first preferred stock should have voting rights, one vote for each share of stock; that the holders of first preferred stock should be entitled to cumulative dividends at the rate of 6% and no more, payable semi-annually on the first days of January and July of each year.

It was further provided that the corporation should have the right to pay off and retire such preferred stock or any part thereof selected by lot, at any dividend period. The certificates of the second preferred stock of the corporation provided as follows: "SIX PER CENT. SECOND PREFERRED STOCK of BRADSHAW-DIEHL COMPANY, transferable only upon the books of the Company by the holder hereof in person, or by his duly authorized attorney, upon the surrender of this Certificate properly endorsed. The said Company at stockholders meeting held February 25, 1930, authorized the issue of One Hundred Thousand ($100,000) Dollars of SIX PER CENT, CUMULATIVE FIRST PREFERRED STOCK, par value One Hundred ($100) Dollars per share, with terms, conditions and provisions as follows:

" 'The holders of the said First Preferred Stock shall be entitled to receive, from the earnings or surplus or net profit of the Company, when and as declared, yearly dividends at the rate of six per centum per annum, and no more, payable semi-annually on the first days of January and July of each year. The dividends on said Preferred Stock shall be cumulative and shall be paid before any dividends on any other stock of the Company shall be set apart or paid.

"The holders of said First Preferred Stock shall have

voting power in any stockholders meeting of the Company, one vote for each share of stock.

" 'Upon any distribution of the assets of the Company, the holder of said First Preferred Stock shall be paid the par value thereof together with unpaid accrued dividends to the date of said payment, at the rate of six per centum per annum, before any distribution shall be made to the holder of any other stock of the Company.

" 'The Company shall have the right to pay and retire such First Preferred Stock, or any part thereof, at any dividend period, the stock so to be retired, if less than all, to be selected by lot.'

" 'The holders of said new Six Per Cent, Second Preferred Stock shall be entitled to receive from the earnings or surplus or net profits of the Company, when and as declared, yearly dividends at the rate of six per centum per annum, and no more payable semi-annually on July 1st and January 1st of each year; said dividends shall be cumulative when the six Per Cent. Cumulative First Preferred Stock, authorized to be issued by stockholders of said Company at their meeting held February 25, 1930, has been paid off and retired;

"The holders of said Six Per Cent, Second Preferred Stock shall have no vote at meetings of the stockholders, but in the event the Company fails to pay at any dividend period any semi-annual cumulative dividend on said Second Preferred Stock after the retirement of said Six Per Cent cumulative First Preferred Stock, then the holders of said Six Per Cent Second Preferred Stock shall be entitled to vote at any meeting of the stockholders of the Company, one vote for each share of stock.

"Upon any distribution of the assets of the Company, the holders of said Second Preferred Stock shall be paid subordinate to the prior rights of the said Six Per Cent Cumulative First Preferred Stock in said assets, at par and unpaid cumulative dividends, if any hereunder, prior

and superior to any other stocks of the Company heretofore or hereafter issued, except said Six Per Cent Cumulative First Preferred Stock.

"The Company shall have the right to pay and retire such Second Preferred Stock, or any part thereof, at any dividend period, the stock so to be retired, if less than all, to be selected by lot."

The quoted portion of certificates evidencing shares of second preferred stock shows clearly the relationship of such stock to the first preferred stock.

The rights of the holders of no par common stock are not clearly delineated in this record, but it is a reasonable inference that the rights of the holders of such stock relative to dividends and distribution of assets were subordinate to the holders of the first and second preferred stock.

The reorganization was effected shortly after the signing of the agreement and all of the then stockholders of the corporation agreed to surrender all of their certificates of stock to The First Huntington National Bank, as Trustee, and in lieu thereof to accept voting trust certificates showing their interest in the corporation. The agreement of February 28, 1930, was signed by all of the stockholders of the corporation and The First Huntington National Bank, Trustee. By the terms of the agreement, all of the affairs of the corporation and its management were placed in the hands of The First Huntington National Bank, as Trustee.

As part of the arrangement made by The First Huntington National Bank, George D. Bradshaw and H. T. Diehl made their joint note for the sum of $100,000.00 and deposited 1000 shares of the first preferred stock in the corporation with such bank as collateral security for the note. Subsequently, Bradshaw seems to have been released from liability on the note; and the note, as reduced from time to time, was signed by H. T. Diehl, as sole maker, who deposited as collateral security, 800

shares of first preferred stock, so that at the time of the transaction with Glen E. Fargo, the 800 shares of first preferred stock were held as collateral security by The First Huntington National Bank for payment of the note above mentioned; 100 shares were held by George D. Bradshaw and 100 shares were held in the treasury of the corporation.

On or about the 21st day of June, 1940, Glen E. Fargo entered into an agreement with The First Huntington National Bank, Trustee, and all the stockholders of the corporation. The result of this agreement was that Fargo acquired for the sum of $45,000.00 nine hundred shares of the first preferred stock of the corporation; 60% of the no par common stock and none of the second preferred stock. The agreement of February 28, 1930, was revoked. The secretary of the corporation was directed by the agreement to issue to Fargo new certificates showing the ownership of the first preferred stock and sixty per centum of the no par common stock, and was further directed to issue to the persons entitled thereto certificates showing their ownership of the second preferred and no par common stock. According to this agreement, there was then outstanding 942.3 shares of second preferred stock and 1000 shares of no par common stock.

It was likewise agreed that Fargo should acquire the 100 shares of first preferred stock held in the treasury of the corporation for the sum of $100.00. The $45,000.00 paid by Fargo was paid to The First Huntington National Bank in discharge of the note then held by it.

On July 3, 1940, another agreement was made by The First Huntington National Bank and Fargo, effectuating the transfer theretofore agreed upon.

On or about the 15th day of July, 1940, a meeting of the stockholders of the corporation was held, at which meeting 900 shares of the first preferred stock held by Fargo and 1000 shares of the no par common stock, represented in person by the holders thereof, were present and voting.

New bylaws were adopted at this meeting and a board

of directors consisting of Glen E. Fargo, Helen Lewis Fargo, George D. Bradshaw, H. T. Diehl, V. N. Diehl and S. S. McNeer were elected directors of the corporation. Helen Lewis Fargo is the wife of Glen E. Fargo and S. S. McNeer was his counsel. The stockholders authorized the sale of 100 shares of first preferred stock to Fargo for the sum of $100.00. Immediately after the stockholders' meeting adjourned, a meeting of the new board of directors was held at which meeting Fargo was elected president, Bradshaw, chairman of the board, H. T. Diehl, vice president and V. N. Diehl as secretary and treasurer. Fargo was also named general manager of the corporation. The new board of directors authorized the sale of 100 shares of first preferred stock to Fargo for $100.00.

It is not deemed advisable to enter into the minutiae of the management of the corporation following the reorganization of the board. It suffices to say that the total assets of the corporation, according to the balance sheet of January 31, 1940, showed a total of $199,174.77. A deficit is shown on the above mentioned balance sheet, amounting to $50,527.89. The balance sheet as of January 31, 1949, shows total assets of $634,867.39 and a surplus of $255,277.59.

From the time the corporation was reorganized and the new board of directors took charge, various sales of second preferred stock were made to Fargo and to the corporation, at prices ranging from $5.00 per share, $10.00 and $40.00 per share. A formal offer was made by the corporation to retire the second preferred stock at par value. In the meanwhile, no payments of dividends has ever been made on the second preferred stock.

W. A. Bibb, acting for the Bibb group, testified that about 1940 or 1941, he had an offer of $10.00 a share for the 50 shares of stock held by the persons composing the Bibb group.

On or about July 6, 1949, in response to a letter signed by V. N. Diehl, secretary and treasurer of the corporation, W. A. Bibb went to see V. N. Diehl and discussed with

him the sale of the stock held by Bibb and his co-owners. No dividends had been paid on the second preferred stock for several years. V. N. Diehl explained to W. A. Bibb that the holders of second preferred stock would not receive any dividends until the cumulative dividends due on the first preferred stock had been paid and the stock retired. W. A. Bibb said to V. N. Diehl, "It doesn't look very hot, does it?" Mr. Diehl said to Mr. Bibb, "It is not very encouraging". After some discussion, Mr. Bibb and his co-owners sold their second preferred stock for $40.00 per share.

Dividends on first preferred stock for the years 1932 to 1941 had been paid, a total of $60,000.00.

In the interim between the time when Fargo and the board of directors took over the management of the affairs of the corporation, it was ascertained that the lease held by the corporation covering the real estate used by them in their merchandising operations would expire the 15th day of July, 1955. Efforts were made by the officers of the corporation to obtain a renewal of the lease, but those efforts were unsuccessful. The corporation had been paying the sum of $12,000.00 per year as rental under the current lease. The owners of the real estate, however, demanded $36,000.00 a year and 3% of the annual gross sales in excess of $800,000.00. With this situation in mind, the directors of the corporation made an effort to locate other suitable real estate on which to build, or rent, but were again unsuccessful. The board then conceived the idea of setting aside some of the corporate income, amounting to approximately $175,000.00 as reserve fund for building. It is not clear whether all the government securities purchased by the corporation or any part thereof were included in the reserve building fund, but it does appear that the corporation did invest $171,000.00 in government securities bearing a low rate of interest.

Testimony was offered by the plaintiffs, of an accountant and other disinterested persons, the burden of which was that the corporation had sufficient funds in its possession to have paid off and discharged the prin-

cipal and cumulative dividends due on the first preferred stock and thereby retire such stock.

As opposed to the testimony adduced by plaintiffs, testimony of one person engaged in a similar business in Huntington and other persons expressed the opinion that the financial position of the corporation was not sufficiently strong to pay off the unpaid cumulative dividends due on the first preferred stock and the principal thereof.

The opinions as to sound management of the corporation are in conflict, but it is not amiss to say that a competitor of the corporation, engaged in the same business and located within a short distance of the store of the corporation, was of the opinion that sound business judgment had been exercised by setting aside the building fund and investing in government securities.

The Meadows group had been offered par value for the 50 shares of second preferred stock now held by it, and refused to surrender its certificates. The Meadows group claims that in addition to the par value of such stock, that it should have been paid 6% cumulative dividends from the time the corporation's financial condition justified the retirement of the first preferred stock. The Bibb group takes the position that it is likewise entitled to cumulative dividends on the stock formerly owned by it from the time the first preferred stock should have been retired, and in addition thereto, it takes the position that the sale of its stock was induced by fraudulent misrepresentations by V. N. Diehl.

The trial court upheld the contentions of the Meadows and Bibb groups and decreed that the Meadows group should recover from the corporation the sum of $5000.00, par value of 50 shares of second preferred stock held by it; that the Meadows group should recover dividends from the corporation at the rate of 6% per annum from the first day of June, 1947, until the 8th day of September, 1952, in the sum of $1700.16 and the interest on the several dividends which should have been paid it from the 8th day of September, 1952, amounting to $266.20.

With respect to the Bibb group, the trial court decreed that the persons composing such group should recover from the corporation the sum of $3000.00, being the difference between the amount paid to them and the par value of the stock formerly held by them; that they recover the sum of $750.00, being the amount of dividends which should have been paid on their second preferred stock held by them from the 1st day of January, 1947, to the 30th day of June, 1949, and that they recover the sum of $44.50 as interest on dividends from September 8, 1952, until paid. All the plaintiffs, including the Bibb group, moved the court to enter personal judgments against the individual defendants, which motion was overruled.

This case presents two basic questions: First, was there fraud or bad faith in the management of the corporation, to the detriment of the holders of second preferred stock? Second, was the sale of the stock held by the Bibb group induced by fraudulent misrepresentation?

This appeal really turns on the question of whether the board or any member thereof, was guilty of fraud, actual or constructive, or acts of bad faith in the management of the corporation after Fargo and his fellow directors assumed control in the year, 1940. We have found no authority in this jurisdiction bearing on that question.

It seems that by statute, the ultimate authority to declare and pay dividends from net profits or surplus of the corporation rests with the board of directors. Section 70, Chapter 24, Acts of the Legislature, 1935, Regular Session.

It is a rule of general application that if there is no fraud or bad faith by the directors, that it is within their discretion whether they declare dividends or otherwise and courts have no right to interfere with such discretion. *Kaufman* v. *Charlottesville Woolen Mills Co.* (Va.) 25 S. E. 1003; *Gibbons* v. *Mahon,* 136 U. S. 549, 10 S. Ct. 1057, 34 Law Ed. 525; *Matter of Kernochan,* 104 N. Y. 618, 629, 11 N. E. 149; *Smith* v. *Southern Foundry Co.* (Ky.) 179 S. W. 205; *Spear* v. *Rockland-Rockport Lime Co.* (Me.) 93 A. 754;

*Hunter* v. *Roberts, Throp & Co.* (Mich.) 47 N. W. 131; *Burden* v. *Burden* (N. Y.) 54 N. E. 17; *Barclay* v. *Wabash Ry. Co.* (2 C.C.A.) 30 Fed. 2d 260. See *Penn.* v. *Pemberton & Penn* (Va.) 53 S. E. 2d 823. II Fletcher Cyclopaedia, Corporations, Permanent Edition, §5325; 55 A.L.R. 49, Annotation, page 8, 51 *et. seq.*, 76 A.L.R. Annotation 885; 13 Am. Jur., Corporations, §709.

In some circumstances, minority stockholders may compel a declaration of dividends. *Dodge* v. *Ford Motor Co.* (Mich.) 170 N. W. 668. See Annotation following *Dodge* v. *Ford Motor Co., supra,* 3 A.L.R. 443. The situation disclosed in the opinion in *Dodge* v. *Ford Motor Co., supra,* does not exist in this case. In *Dodge* v. *Ford Motor Co., supra,* the cash position of the corporation was far different from that shown in this record and it was proposed by the management of the Ford Motor Company that funds of the corporation should be used for humanitarian purposes. No such proposition exists in the instant case.

At least one court grounds the right and power of a court to interfere with the discretion of corporate directors on a showing of mismanagement. *Rollins* v. *Denver Club,* (Colo.) 96 P. 188.

There may be ground for suspicion that Fargo dominated the board of directors of the corporation and it may have been that it was not good business judgement to buy the securities issued by the United States Government and allow the 6% cumulative dividends on the first preferred stock to go unpaid. We cannot say, however, that such acts by the board or any member thereof, amounted to fraud, actual or constructive, or bad faith. We have examined with care this record extending over a period of ten years or more of business, and it is not inaccurate to say that the business of the corporation seems to have prospered from 1940 until the institution of this suit.

The interest of the holders of first preferred stock in the corporation and other holders of second preferred stock were somewhat antagonistic, but we must bear in mind

that when Fargo purchased the first preferred stock and 60% of the no par common stock, the worth of the second preferred stock was problematical. Some witnesses say that it was worth approximately $.08 a share.

Certainly the owners of the majority of shares of the corporation occupy the position of fiduciary for the minority stockholders. *Southern Pac. Co.* v. *Bogert*, 250 U. S. 483, 39 S. Ct. 533, 63 Law Ed. 1099. The same rule has been applied in this jurisdiction as to officers and directors of a corporation occupying a fiduciary relationship in rela-tion to the stockholders. *Chounis* v. *Laing*, 125 W. Va. 275, 23 S. E. 2d 628; *Felsenheld* v. *Tobacco Co.*, 119 W. Va. 167, 192 S. E. 545; *Staker* v. *Reese*, 82 W. Va. 764, 97 S. E. 641. But no violation of such duty is shown in this instance.

The plaintiffs contend that the trial court's decree, and an opinion which is made a part of the record, discloses that the court found that the board of directors was guilty of fraud or bad faith. The decree of the court is silent as to whether or not such finding was made. The language of the opinion filed by the judge of the trial court is not clear whether such factual finding was made. A careful reading of the opinion, which is made a part of the record, does not clearly show whether the judge of the trial court made a finding of fact as to fraud and bad faith or otherwise.

Numerous cases are cited by the plaintiffs to the effect that the finding of the trial chancellor will not be disturbed on appeal unless clearly wrong or against the plain preponderance of the evidence. This, undoubtedly, is the law in this jurisdiction. *Mullens* v. *Frazer*, 134 W. Va. 409, 59 S. E. 2d 694; *Carpenter* v. *Ohio R. S. & G. Corp.*, 134 W. Va. 587, 60 S. E. 2d 212; *Boyd* v. *Realty Co.*, 131 W. Va. 150, 46 S. E. 2d 633; *Bennett* v. *Neff*, 130 W. Va. 121, 42 S. E. 2d 793; *Johnston* v. *Terry*, 128 W. Va. 94, 36 S. E. 2d 489; *Spradling* v. *Spradling*, 118 W. Va. 308, 190 S. E. 537; *Wade* v. *Wade*, 115 W. Va. 132, 174 S. E. 787; *Bank* v. *McCloud*, 112 W. Va. 537, 165 S. E. 799; *Kincaid* v. *Evans*, 106 W. Va. 605, 146 S. E. 620. Numerous other cases may be cited for that proposition, but the foregoing will suffice.

As has been hereinabove stated, fraud or bad faith is necessary to warrant a court in interfering with the discretion of a board of directors with reference to the declaration of dividends. Likewise, the language of the certificates of stock of the first and second preferred stock fixes no time for the retirement of either of such classes of stock, nor is the happening of any event provided for in the certificates evidencing the ownership of either class of stock. We therefore hold that the directors of the corporation had discretion as to when either or both classes of such stock should be retired. We reiterate that no fraud or bad faith is disclosed by this proof. Since there is no showing of that kind, it follows that the finding of the trial chancellor was without evidence to support it and may therefore be set aside without violating the rule of law above adverted to, with reference to a finding of fact by a trial chancellor.

The bill of complaint filed by the original plaintiffs, the Meadows group, asserted the right to the payment of par value of the second preferred stock. On or about the 5th day of December, 1949, the corporation called in the Meadows stock at par value. They are therefore entitled to have and receive from the corporation the par value of such stock, amounting to $5,000.00.

The Bibb group, in its petition and by its intervention, seeks the payment of the balance of par value of its stock on the ground that it was induced to part with its stock on the grounds of misrepresentation or fraud, made to or perpetrated on it by V. N. Diehl. We can find no fraud nor misrepresentation in that transaction. Therefore, the Bibb group is not entitled to the amount of $3000.00 decreed to it by the trial court. Neither the Bibb nor the Meadows group is entitled to any dividends on its stock, cumulative or otherwise.

It is thus seen that the bill of complaint and the petition of the Bibb group do not seek different relief. All of this litigation bears on the right of both groups to dividends on their stock and the payment of the par value thereof.

It follows that the bill of complaint and the petition of the Bibb group do not come within the rule with reference to multifariousness. The joinder in this bill and the petition are not distinct and independent of each other. See I Hogg's Equity Procedure, Miller, Third Edition, §156 and §157.

The rule announced by this court in the first point of the syllabus of *Bean* v. *County Court*, 85 W. Va. 186, 101 S. E. 254, and the *County Court* v. *Gas Co.*, 80 W. Va. 486, 92 S. E. 726, is not applicable to the factual situation disclosed by the pleadings and proof in this suit.

On the contrary, we think that the following quoted syllabus from *Travis* v. *Travis*, 116 W. Va. 541, 182 S. E. 285, states the rule to be applied in this instance. "Where matters impleaded in a bill in chancery are interwoven and center around the same general subject matter and can be more conveniently settled together than separately, the bill will not ordinarily be regarded as multifarious." We therefore conclude that the bill and petition are not multifarious.

The plaintiffs in their brief make a cross assignment of error in that the court overruled their motion to strike page 17 of defendant's answer on the ground that the same is not responsive to the bill and was impertinent and irrelevant. We find no merit in such cross assignment of error.

In accordance with the foregoing, we affirm that part of the decree which decreed to the Meadows group the payment of par value of second preferred stock held by it. We reverse the decree of the trial court insofar as it decreed any dividends to the Meadows group, with interest thereon. We also reverse the decree of the trial court insofar as it decrees to the Bibb group the recovery of $3000.00 and dividends on its stock, together with interest on the unpaid dividends, and remand the cause to the Circuit Court of Cabell County, with directions that upon

the payment of the $5000.00 decreed to the Meadows group, that the bill of complaint be dismissed.

*Affirmed in part;*
*reversed in part and*
*remanded with directions.*