**ARKOMA BASIN EXPLORATION COMPANY, INC., Arkoma Basin Minerals, Inc., and Mark S. Kelldorf, Appellants,**

v.

**FMF ASSOCIATES 1990–A, LTD., FMF Associates 1988–B, Ltd., FMF Lazare, Ltd., FMF HMY, Ltd., FMF Kahn, Ltd., FMF Friedman, Ltd., FMF Greenwald, Ltd., and FMF Smallwood, Ltd., Appellees.**

No. 05–02–00669–CV.

Court of Appeals of Texas, Dallas.

Aug. 21, 2003.

Rehearing Overruled Nov. 6, 2003.

**450**

P. Michael Jung, Strasburger & Price, L.L.P., Dallas, for appellants.

Cynthia Hollingsworth, Jeremy Martin, Gardere, Wynne, Sewell, L.L.P., Dallas, Brian P. Sanford, Sheils Winnubst Sanford & Bethune, Richardson, for appellees.

Before Justices MORRIS, JAMES, and FITZGERALD.

## OPINION

Opinion by Justice FITZGERALD.

Arkoma Basin Exploration Company, Inc., Arkoma Basin Minerals, Inc., and Mark S. Kelldorf appeal the trial court's judgment following a jury trial in this fraud action awarding $2,936,952.01 to FMF Associates 1990–A, Ltd., FMF Associates 1988–B, Ltd., FMF Lazare, Ltd., FMF HMY, Ltd., FMF Kahn, Ltd., FMF Friedman, Ltd., FMF Greenwald, Ltd., and FMF Smallwood, Ltd. Appellants assert on appeal that the trial court erred in entering judgment for the partnerships because: (1) there is no evidence appellants misrepresented any present or existing fact; (2) there is no evidence the partnerships reasonably relied on the alleged misrepresentations by appellants; (3) there is no evidence of privity between appellants and the partnerships as required to prove benefit-of-the-bargain damages; and (4) there is no evidence of the difference between the value of the property as represented and delivered. The partnerships bring a cross appeal asserting the trial court erred by reducing the amount of damages the jury found and then remitting a portion of the damages found by the jury. The partnerships bring a second cross-issue conditioned on our remanding the cause on other grounds and asserting the trial court erred by applying Virginia law and not Texas law. We set aside part of the trial court's suggestion of remittitur and part of appellees' remittitur, and we otherwise affirm the trial court's judgment.

## BACKGROUND

Frank Foley and his company, FMF Oil and Gas Properties, Inc., put together limited partnerships to fund oil and gas ventures. In 1986, Foley met Mark Kelldorf, president and owner of Arkoma Basin Exploration Co. (ABE). Kelldorf told Foley that ABE had a large, unique database for the Arkoma Basin, a large natural gas producing field in Oklahoma and Arkansas. Kelldorf told Foley that the database could locate the owners of mineral rights in the Arkoma Basin, analyze the mineral rights, compute the remaining reserves, and estimate "a definitive cash flow" for existing wells and wells expected to be drilled in an area. Foley was impressed by ABE's database.

Between 1988 and 1991, Foley formed the limited partnerships, appellees, and used ABE to select and obtain the mineral rights to acreage in the Arkoma Basin that would be held by the partnerships. In the private placement memorandum sent to potential investors, Foley included information obtained from ABE about the reserves remaining in the properties to be purchased by the partnerships. For ABE's services, Foley paid ABE a "double commission" of seven to ten percent of the money Foley paid for the mineral rights and a ten-percent share of the mineral rights. According to the partnerships' wit-

nesses, to justify a higher price for the mineral rights, ABE stated the reserves were much higher than the wells' history and the scientific data indicated was appropriate.[1] The partnerships' witnesses also testified ABE increased the length of time the wells would be producing, estimating the life span of some of the wells at nearly 250 years. Foley gave ABE's projections of gas production and estimations of reserves to Hunter Herron, who converted ABE's information into the amount of cash investors in the partnerships could expect to receive. Based on all this information, investors bought into the eight limited partnerships, which acquired the mineral rights from ABE for approximately $1.6 million. When the properties failed to produce the amount of gas ABE had predicted, Foley hired Michael Harper to investigate whether ABE had misrepresented the reserves.

The limited partnerships sued ABE for actual and constructive fraud, negligent misrepresentation, and violations of the Texas Deceptive Trade Practice–Consumer Protection Act. On ABE's motion, the trial court determined Virginia law applied to the case. The trial court submitted the actual and constructive fraud causes of action to the jury, which found for the partnerships and determined their combined damages from the fraud totaled $5.5 million. The trial court's judgment reduced some of the damages found by the jury and subsequently suggested a remittitur, reducing the partnerships' total damages to $2,936,952.01.

## FRAUD

■ In their first issue, appellants assert the evidence does not support the jury's answers to the questions about actual and constructive fraud. To prove actual fraud under Virginia law, a party must prove: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 515 S.E.2d 291, 297 (1999). Constructive fraud requires a party show "that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation." *Mortarino v. Consultant Eng'g*, 251 Va. 289, 467 S.E.2d 778, 782 (1996). Thus, the principal difference between the two causes of action is the intent with which the misrepresentation is made. *Blair Constr., Inc. v. Weatherford*, 253 Va. 343, 485 S.E.2d 137, 139 (1997). Under Virginia law, both actual and constructive fraud must be proved by clear and convincing evidence. *Prospect Dev. Co.*, 515 S.E.2d at 297; *Mortarino*, 467 S.E.2d at 782.

## Standard of Review

In determining the legal sufficiency of evidence to support a finding under the clear and convincing evidence standard, the reviewing court examines all the evidence in the light most favorable to the finding. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). The court does not disregard all evidence not supporting the finding, but it disregards all evidence contrary to the finding that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* If, under this standard, the court determines a reasonable trier of fact could have formed a firm belief or conviction that its finding was true, the evidence is legally sufficient. *Id.*

---

1. Appellants' witnesses testified the determination of the reserves was accurate based on the available information and that the partnerships' witnesses failed to properly analyze the data.

### Actionable Misrepresentation

In their issue 1a, appellants argue there is not legally sufficient clear and convincing evidence appellants made a misrepresentation to the partnerships subject to an action for fraud. Appellants argue they provided only opinions, predictions, and projections to the partnerships concerning the production of the wells. Appellants assert a claim for fraud or constructive fraud must be based on a misrepresentation of present or pre-existing facts, not opinions or statements of future events.

■ Under Virginia law, "It is well settled that a misrepresentation, the falsity of which will afford ground for an action for damages, must be of an existing fact, and not the mere expression of an opinion. The mere expression of an opinion, however strong and positive the language may be, is no fraud." *Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 553 S.E.2d 714, 717 (2001) (quoting *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 540 S.E.2d 134, 142 (2001) (quoting *Saxby v. S. Land Co.*, 109 Va. 196, 63 S.E. 423, 424 (1909))). The Virginia courts have not "established a bright line test to ascertain whether false representations constitute matters of opinion or statements of fact." *Lambert*, 553 S.E.2d at 717 (quoting *Yuzefovsky*, 540 S.E.2d at 142 (quoting *Mortarino*, 467 S.E.2d at 781)). Instead, each case is judged on its own facts "taking into consideration the nature of the representation and the meaning of the language used as applied to the subject matter and as interpreted by the surrounding circumstances." *Yuzefovsky*, 540 S.E.2d at 142 (quoting *Mortarino*, 467 S.E.2d at 781 (quoting *Packard Norfolk, Inc. v. Miller*, 198 Va. 557, 95 S.E.2d 207, 211 (1956))). However, the Virginia courts recognize that "commendatory statements, trade talk, or puffing do not constitute fraud because statements of this nature are generally regarded as mere expressions of opinion which cannot rightfully be relied upon, at least where the parties deal on equal terms." *Lambert*, 553 S.E.2d at 717 (quoting *Tate v. Colony House Builders*, 257 Va. 78, 508 S.E.2d 597, 600 (1999)).

■ In this case, Foley hired appellants to identify, evaluate, and aid in the acquisition of mineral rights in the Arkoma Basin. Appellants held themselves out as having superior knowledge in the Arkoma Basin. However, the partnerships presented evidence that appellants did not deal honestly with Foley in making their evaluation of the gas reserves. Sonia Horton, petroleum landman for appellants, testified Kelldorf would have his engineer, Levent Kecik, determine the reserves for the mineral interests. If Kecik's calculation of the reserves did not show the reserves were as high as Kelldorf had hoped, Kelldorf would be displeased. On one occasion, Kelldorf told Kecik, "you're killing me, man. I can't do anything with these." Kecik would then "rerun the projections," and he would return with increased reserves. Harper testified about numerous ways appellants manipulated the data to increase their determination of the gas reserves of the mineral interests. For example, Harper testified that appellants' estimates included the production of wells to be drilled between existing wells, but they did not take into consideration the fact that the additional wells would reduce the production and life span of the existing wells.[2] Thus, appellants' manipulation of the data overstated the reserves by two to three times and the life of the wells by several

---

**2.** The witnesses used the example of a glass of soda with straws being put into it. With each new straw put in the glass, the amount of soda removed through any particular straw will be reduced, and the glass will be emptied sooner.

times. Appellants determined that certain new wells might produce for up to 200 or even 250 years; Harper testified these calculations were "preposterous" and that the wells would produce for only thirty to fifty years. Harper also testified Kecik's spreadsheets showed Kecik was not working from the data through the necessary calculations to determine the reserves; instead, Kecik started with the figure he wanted the reserves to be and then worked backward through the calculations to determine what the data had to be to support those reserves. Harper testified the evidence showed appellants intentionally manipulated the data and intentionally misrepresented the reserves to the partnerships.

■ Honest estimates, projections, opinions, etc. are not actionable for fraud under Virginia law. *Lambert,* 553 S.E.2d at 717; *DeJarnette v. Thomas M. Brooks Lumber Co.,* 199 Va. 18, 97 S.E.2d 750, 757 (1957). However, when a party's opinions are based on information it knows is false, the opinions become actionable as fraudulent misrepresentations when those opinions are used to mislead the plaintiff. In *Horner v. Ahern,* 207 Va. 860, 153 S.E.2d 216 (1967), the plaintiffs purchased a home from the sellers through their realtor. *Id.* at 217. The contract for the sale of the house required the sellers to provide a report of no termite infestation or damage. Any termite damage would permit the plaintiffs to cancel the contract. *Id.* at 218. The realtor sent the plaintiffs a report from a termite company stating it had found and treated a termite infestation and that no other infestations were found. The report did not state whether any termite damage was present. The realtor told the plaintiffs that if there were any termite damage, the report would say so. Unbeknownst to the plaintiffs, the realtor had concealed an earlier report stating the house had suffered extensive termite damage. *Id.* The plaintiffs sued for fraud, and the defendants argued the realtor's representation was not actionable for fraud "because it was a mere expression of opinion as to the extent of such damage or as to the effect of a written instrument." *Id.* at 220. The Virginia Supreme Court held the realtor's opinion was actionable for fraud because he "asserted as true that which, allegedly, he knew to be false in order to induce the plaintiffs to settle upon their contract." *Id.* Likewise, in this case, appellants' representations of the reserves were actionable because they knew those representations were false because they had manipulated the data. Just as the realtor in *Horner* misrepresented the termite report to mislead the plaintiffs into believing the house had suffered no termite damage to induce them to purchase the house, so appellants made the misrepresentations to mislead appellees into believing the mineral rights contained particularly high gas reserves to induce them to purchase the mineral rights.

Appellants' assertion that their representations were "opinions" does not make their representations immune from fraud claims. The Virginia Supreme Court has not hesitated to find representations subject to fraud claims even though the defendants asserted the representations were opinions. In *Tate v. Colony House Builders, Inc.,* 257 Va. 78, 508 S.E.2d 597 (1999), the defendant, a home seller, asserted its statements that the new house was free from structural defects, was constructed in a workmanlike manner, and was fit for habitation were its opinions and were not subject to a claim for fraud. *Id.* at 598. The Virginia Supreme Court, however, held the statements were representations of existing fact and were subject to the home buyer's fraud claims. *Id.* at 600. In *Mortarino,* the defendant engineering consultants performed a wetlands survey for a

real estate developer and told the developer there was only a slight chance that a small portion of the property might be declared wetlands and that "[o]n the vast majority of the property the [wetlands expert] finds nothing to indicate that wetlands are present." *Mortarino,* 467 S.E.2d at 780. The engineering consultants told the real estate developer that different interpretations of the extent of wetlands was possible and the statements were merely their opinion. *Id.* In reliance upon these representations, the developer paid a particular price for the property. *Id.* Subsequently, it was determined that over eighty percent of the property was wetlands. *Id.* In the ensuing lawsuit, the engineering consultants asserted the statements about the extent of wetlands were opinions and were not subject to a claim for fraud. *Id.* at 781. Although the engineering consultants asserted that the representation was an opinion and that the real estate developer was told the representation was an opinion, the Virginia Supreme Court disagreed and held, "These statements are unambiguous representations of the present quality or character of the property and, thus, are representations of fact, and not mere expressions of opinion." *Id.; see also Daughtrey v. Ashe,* 243 Va. 73, 413 S.E.2d 336, 338 (1992) (representation of jeweler selling diamond bracelet that diamonds were v.v.s. quality was subject to breach of warranty claim despite jeweler's assertion that the representation of the diamonds' quality was his opinion); *Packard Norfolk, Inc. v. Miller,* 198 Va. 557, 95 S.E.2d 207 (1956) (car salesman's statement that new car was "in perfect running condition" was subject to breach of warranty claim despite seller's assertion that the statement was his opin-

ion). As in *Tate* and *Mortarino,* there is some clear and convincing evidence that appellants made misrepresentations of existing fact, the amount of gas reserves in the ground included in the mineral rights. Appellants' assertion that the representations were merely opinions does not shield them from claims of fraud.

This case is distinguishable from Virginia cases where the statement is an honest expression of the maker's opinion. In *DeJarnette v. Thomas M. Brooks Lumber Co.,* 199 Va. 18, 97 S.E.2d 750 (1957), the purchaser, DeJarnette, and an officer of the seller of timber rights on 116 acres, Brooks, "cruised" through the timber and agreed on a representative acre. After walking through the representative acre, DeJarnette and Brooks agreed it would cut 30,000 to 45,000 board feet, for a total timber production on the 116 acres of about three million board feet. The evidence at trial showed this was Brooks's "best estimate" and was a mere expression of his opinion. *Id.* at 757. Because it was only Brooks's opinion, i.e., his "best estimate," it was not a statement of fact subject to a claim for fraud. *Id.*[3] In this case, however, there is some clear and convincing evidence that appellants' representations were not their "best estimates" but were knowingly false statements of the amount of the gas reserves made with the intent to deceive appellees to their detriment and appellants' advantage.

⬛ Appellants also argue their calculations of the reserves are not actionable for fraud because they were merely estimations, which are inherently speculative. Part of the process of determining the quantity of reserves involves estimating

---

**3.** *See also Saxby v. S. Land Co.,* 109 Va. 196, 63 S.E. 423, 424 (1909) (land seller's representation "that there was about 150 acres in timber and 20 acres burned over" was state- ment of seller's opinion and was not subject to claim for fraud even though in fact there were only about 120 acres in timber of which about 60 acres had been burned over).

the future price of gas,[4] which witnesses testified was a highly speculative endeavor. However, as shown by *Tate* and *Mortarino*, the fact that discretion is involved in the determination of the matter represented does not shield the representation from a fraud claim. Moreover, Harper's testimony demonstrated that appellants' misrepresentation of the amount of reserves was not the result of differences in predicted gas prices but of appellants' exaggeration of the quantity of gas in the ground.

■ Even assuming appellants' representations of the gas reserves were opinions under Virginia law, we conclude they still would be subject to a claim for fraud because they are opinions which were supposed to be based on particular data and calculations using the data. Appellants told the partnerships they had determined the reserves using a particular process, and the partnerships presented some clear and convincing evidence that appellants did not use that process but falsified the results through manipulation and falsification of the data and calculations. When estimates and opinions are based on deliberate, intentional falsification of the data and calculations, they are the product of falsified facts and part of the fraudulent misrepresentation. When those estimates are made to a person without the maker's special knowledge of the subject matter, those estimates, if intentionally misrepresenting the facts, are actionable. *See Horner*, 153 S.E.2d at 220–21; *see also Mortarino*, 467 S.E.2d at 781–82 (negligent misrepresentation about extent of wetlands on property was constructive fraud even though extent of wetlands is opinion).

We conclude legally sufficient evidence shows appellants' representations of the gas reserves are actionable as fraud under Virginia law because appellants intentionally falsified the existing facts underlying the representations. Under these conditions, appellants' representations of the gas reserves are actionable for actual fraud because they were made for the purpose of misleading appellees. We resolve appellants' issue 1a against them.

### Reliance

■ In their issue 1b, appellants assert no evidence shows the partnerships reasonably relied on the misrepresentations. Appellants first argue it was legally impossible for the partnerships to rely on the statements. At the time appellants made the representations, the certificates of limited partnership had not been filed; thus, the limited partnerships did not exist and could not have relied. This Court has held that the filing of the certificate of limited partnership is necessary to put the public on notice of the liability limitations provided by law. *Garrett v. Koepke*, 569 S.W.2d 568, 569 (Tex.Civ.App.-Dallas 1978, writ ref'd n.r.e.); *see Brewer v. Tehuacana Venture, Ltd.*, 737 S.W.2d 349, 352 (Tex. App.-Houston [14th Dist.] 1987, no writ) (citing *Garrett*). However, if the party with whom the partnership is dealing is aware the partnership is a limited partnership, then the filing of the certificate is not necessary for the entity to be a limited partnership. *Garrett*, 569 S.W.2d at 569. The evidence shows appellants were aware the mineral rights would be held by the limited partnerships. The agreements for the sale of the mineral interests stated the deeds were to be in the names of the limited partnerships. We conclude the record contains evidence the limited partnerships existed and thus could rely on appellants' misrepresentations.

4. Gas reserves are not simply the amount of gas in the ground; reserves are the amount of gas in the ground that can be profitably harvested. Thus, the price of gas affects the amount of reserves.

■ Appellants also argue the partnerships could not rely on the information provided by appellants because that information was accompanied by a nondisclosure agreement:

### NON–DISCLOSURE AGREEMENT

The information contained in this booklet is proprietary and has been prepared solely for the benefit of Arkoma Basin Exploration Company (ABE Company) clients.

Recipients are prohibited from reproducing, distributing, or disclosing any of the enclosed contents in whole or in part to any third party without the prior written consent of ABE Company.

ABE Company makes no representation or warranties with respect to oil or gas price forecasts, applicable tax rates, or any other economic projections contained in this booklet.

This report is furnished on the condition that no errors arising out of or relative to information contained herein or omissions hereof shall give rise to any right or claim against ABE Company.

Appellants assert, and Kelldorf testified, that Foley and his corporation were their clients, not the partnerships, and they assert they never gave Foley permission to disclose the information to the partnerships or to investors in the partnerships. However, David Wimer, an investor and limited partner in two of the partnerships, testified that the partnerships were the clients of ABE. Foley testified that the "client" referenced in each of the nondisclosure agreements was one of the partnerships. The record also contains evidence that Kelldorf met with potential investors in the partnerships to promote the partnerships and was well aware that the partnerships would own the mineral rights. We conclude the record contains legally sufficient clear and convincing evidence the partnerships were entitled to rely on the misrepresentations. We resolve appellants' issue 1b against them.

### PRIVITY

■ In their second issue, appellants assert the partnerships are not entitled to recover benefit-of-the-bargain damages absent privity of contract with Kelldorf or ABE. Appellants assert that under Virginia law, a plaintiff seeking damages in tort for purely economic losses must be in privity with the defendant. *Copenhaver v. Rogers,* 238 Va. 361, 384 S.E.2d 593, 595 (1989); *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55, 56–57 (1988); *Blake Constr. Co. v. Alley,* 233 Va. 31, 353 S.E.2d 724, 725–26 (1987). All the cases appellants cite involve causes of action for negligence, not actual fraud. The economic loss rule applies in cases of negligence and constructive fraud, but it does not apply to actual fraud. *See Ward v. Ernst & Young,* 246 Va. 317, 435 S.E.2d 628, 632 n. 2 (1993); *City of Richmond, Va. v. Madison Mgmt. Group, Inc.,* 918 F.2d 438, 447 (4th Cir.1990). Accordingly, appellants' arguments lack merit insofar as the partnerships' actual fraud claim is concerned. Because the jury's finding of actual fraud supports the award of damages against appellants, any error arising from the partnerships' lack of privity, if any, on the constructive fraud claim did not "probably cause the rendition of an improper judgment" and is harmless. Tex.R.App. P. 44.1(a)(1). We resolve appellants' second issue against them.

### DAMAGES

■ In their third issue, appellants assert the partnerships were not entitled to recover benefit-of-the-bargain damages because they failed to prove the difference between the value of property as repre-

sented and the value as delivered. In a fraud case under Virginia law, a plaintiff is entitled to recover benefit-of-the-bargain damages. *Prospect Dev. Co.*, 515 S.E.2d at 300. Appellants state in their brief that the following instruction in the jury charge properly incorporated Virginia law:

> Consider these elements of damages and none other: the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the representation been true, if any.

Harper presented detailed testimony describing his method of valuing the mineral interests, both as they were at the time of the contract and as represented by appellants. He testified to the difference in "value" of three of the partnerships: 1988–B, 1990–A, and Lazare. Foley testified to the difference in "value" of the remaining five partnerships, HMY, Kahn, Friedman, Greenwald, and Smallwood. The loss of "value" testified to by Harper and Foley was the difference between the value of the mineral interests with the reserves as represented by appellants and the value of the mineral interests with the reserves as they actually were on the date they were sold to the partnerships as calculated by Harper.

### Fair Market Value

Appellants argue Harper's and Foley's testimony is legally insufficient to prove the damages because they did not testify, and the evidence does not show, that their "value" calculations concerned the "fair market value" of the mineral interests. Appellants also argue that Harper's and Foley's testimony omitted an element for valuation of real estate through income production, the capitalization rate. *See City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 183 (Tex.2001); *Polk Coun-*

*ty v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex.1977).

Legal sufficiency claims from a jury trial must be preserved through a motion for instructed verdict, an objection to the charge, a motion for judgment notwithstanding the verdict, or a motion for new trial. *U.S.A. Precision Machining Co. v. Marshall*, 95 S.W.3d 407, 411 (Tex. App.-Houston [1st Dist.] 2002, pet. denied). Factual sufficiency claims from a jury trial must be preserved through a motion for new trial. *J.M. Krupar Constr. Co. v. Rosenberg*, 95 S.W.3d 322, 336 (Tex.App.-Houston [1st Dist.] 2002, no pet.). The objections raised in the motions must be specific enough to call the trial court's attention to the precise lack of sufficiency asserted on appeal. TEX.R. CIV. P. 321; *Samedan Oil Corp. v. Intrastate Gas Gathering, Inc.*, 78 S.W.3d 425, 448–49 (Tex.App.-Tyler 2001, pet. granted, judgm't vacated w.r.m.); *City of Houston v. Precast Structures, Inc.*, 60 S.W.3d 331, 335 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). In this case, appellants did not raise in a motion for directed verdict, an objection to the charge, a motion for judgment notwithstanding the verdict, or a motion for new trial their arguments that Harper's and Foley's testimony failed to prove "fair market value" or that they needed, and failed, to present evidence of a capitalization rate. Accordingly, these arguments were not preserved for appellate review.

### Sufficiency of Harper's Testimony: 1988–B, 1990–A, and Lazare

Appellants also argue Harper's testimony failed to establish the value of the mineral interests "at the time the contract was made." Harper used the data available at the time of the representations to determine the reserves. However, his value calculations required the application

of a gas price to yield a dollar value for the mineral rights. Harper used two different prices, both of which were based on the actual price of gas, either the average price received by the partnerships or the average price in Oklahoma, during the first eight years that the partnerships owned the mineral rights. Appellants argue that Harper, by using the actual gas price received (market price) and the actual gas price listed in the Oklahoma newspaper (average price) during the eight years after signing the contracts, instead of a foreseeable price at the time of the contracts, failed to prove the value at the time of the contracts. Appellants did not raise this argument in a motion for instructed verdict, an objection to the jury charge, a motion for judgment notwithstanding the verdict, or a motion for new trial. Accordingly, this argument also was not preserved for appellate review.[5]

Appellants also assert Harper's testimony is legally insufficient to support the award of damages because it is too speculative to support an award of damages based on the arguments appellants subsequently make in their brief. As discussed above, these arguments were not preserved for appellate review. Accordingly, this argument lacks merit.

We conclude appellants failed to preserve the legal sufficiency arguments they present on appeal regarding the award of damages to the 1990–A, 1988–B, and Lazare partnerships. We resolve appellants' third issue against them to the extent it concerns those partnerships.

### Foley's Testimony: The Five Smaller Partnerships

Appellants argue Foley's testimony is legally insufficient to establish one of the

elements for benefit-of-the-bargain damages, the actual value of the mineral interests at the time of the contract.

Foley testified to two different measures of damages. In the first measure of damages, Foley started with the purchase price each partnership paid ABE for its mineral rights, which Foley used in the damages formula in place of the actual value of the mineral rights. Foley used the purchase price instead of the actual value of the mineral rights because he testified he did not know the actual value of the mineral rights. Foley then determined the amount of represented reserves for each partnership and multiplied that by a gas price; Foley subtracted the purchase price from this amount. Foley then subtracted the management fees (varying from $0 to $23,764) and a 3% margin of error, and the remainder was the amount of damages suffered by each partnership. For the second measure of damages, Foley determined the percentage each partnership invested in the total mineral rights and multiplied that percentage by the total damages of the partnerships as initially determined by Harper, and the product was the proportional share of the damages suffered by that partnership.

▬▬▬ Under the first measure of damages, appellants argue there is no evidence of the actual value of the mineral interests at the time of the contract because Foley testified he did not know their actual value. Appellants preserved this argument by presenting it in their motion for judgment notwithstanding the verdict. Appellants argue the purchase price is no evidence of actual value and cannot be

---

**5.** The evidence shows the gas prices Harper used were as foreseeable as those appellants used. Harper testified: "This $1.60 [market gas price] is the same number that I used that

ABE used. They [appellants] start off with $1.50 or $1.65. So—and they escalate. In fact, they escalate 15 percent a year. I'm escalating 5."

substituted for actual value in determining benefit-of-the-bargain damages. The partnerships argue that the use of the purchase price of the mineral interests as a substitute for proof of their actual value is approved by case law, including *McCown v. Jennings*, 209 S.W.2d 408, 411–12 (Tex. Civ.App.-Fort Worth 1948, no writ). The court stated in *McCown*, "The general rule as to the measure of damage on a breach of warranty is the difference between the actual value of the goods and what the value would have been if the goods had been as warranted, but, ... the purchase price ... may be taken as a fair measure of the value of the goods if as warranted...." *Id.* This measure of damages is known as "out of pocket" damages, and it differs from benefit-of-the-bargain damages by using the purchase price in place of the represented value of the property. *See Latham v. Castillo*, 972 S.W.2d 66, 70 (Tex.1998); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex.1998). In this case, the partnerships did not seek out-of-pocket damages, and no instruction for out-of-pocket damages was submitted to the jury. Regardless, however, neither *McCown*, nor any other case permits the purchase price to be used as actual value in determining benefit-of-the-bargain damages.[6]

■ We conclude the partnerships presented no evidence of the actual-value element for the benefit-of-the-bargain damages suffered by HMY, Kahn, Friedman, Greenwald, and Smallwood under Foley's first measure of damages. By presenting no evidence of the actual value of the mineral interests purchased by these five partnerships, these partnerships "offered no evidence to furnish a range within which a jury could exercise its discretion to award damages in the first place.

Without some evidence of the [actual] value ... [of] the items, the evidence is legally insufficient to support" the jury's damages award. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex.2002); *see also Prospect Dev. Co.*, 515 S.E.2d at 300; *Wharton, Aldhizer & Weaver v. Savin Corp.*, 232 Va. 375, 350 S.E.2d 635, 637 (1986). We hold the five smaller partnerships, HMY, Kahn, Friedman, Greenwald, and Smallwood, may not recover any damages under Foley's first measure of damages.

■ However, any error flowing from the lack of evidentiary sufficiency under the first measure of damages is harmless if Foley's second measure of damages withstands appellants' challenges on appeal. Concerning this method of determining damages, proportional distribution of the total loss in value to all the partnerships as determined by Harper, appellants argue that no evidence shows the damages were proportional to the investment of each partnership. Appellants also argue that the figure the partnerships used for total damages to the partnerships was no evidence of damages because Harper testified that damage figure had been "subsequently revise[d]." Appellants did not raise these arguments in a motion for instructed verdict, an objection to the jury charge, a motion for judgment notwithstanding the verdict, or a motion for new trial. Accordingly, these arguments are not preserved for appellate review. We resolve appellants' third issue against them.

## REDUCTION AND REMITTITUR

In their first cross-issue, the partnerships question whether the trial court erred in reducing and then remitting the damages awarded by the jury.

6. A plaintiff's use of the purchase price as the actual value of the property at the time of the sale would prove the property was worth what the plaintiff paid.

## Reduction of Damages

 The jury awarded 1990–A $1,760,000; it awarded HMY $220,000; and it awarded Greenwald $270,000. In the January 29, 2002 judgment, the trial court stated, "the Court finds that to conform to the evidence at trial, the award to FMF Associates 1990–A, Ltd., should be remitted to $1,083,171, the award to FMF Associates HMY, Ltd., should be remitted to $136,200, and the award to FMF Greenwald, Ltd., should be remitted to $244,000." The partnerships correctly observe that a trial court may "suggest" a remittitur to a plaintiff, conditioned on the granting of a new trial if the plaintiff refuses the remittitur, but it cannot compel a remittitur. *Galveston County Fair & Rodeo, Inc. v. Glover*, 880 S.W.2d 112, 122 (Tex.App.-Texarkana 1994), *writ denied,* 940 S.W.2d 585 (Tex.1996) (per curiam). What the trial court did in this case was modify the damages from those awarded by the jury, essentially granting judgment notwithstanding the verdict. *See id.* Thus, the trial court's modification of those damages from $1,760,000 to $1,083,171, $220,000 to $136,200, and $270,000 to $244,000 is appropriate only if there is no evidence to support the jury's findings. *See Shell Oil Prods. Co. v. Main Street Ventures, L.L.C.,* 90 S.W.3d 375, 387 (Tex. App.-Dallas 2002, pet. dism'd by agr.); *Galveston County Fair & Rodeo, Inc.,* 880 S.W.2d at 122.

 Harper testified the value loss to 1990–A was either $1,083,171 using the "market gas price" or $1,273,536 using the "average gas price." However, Harper also testified that "no one's going to pay you" the average gas price. Harper was the only witness who testified to the value loss suffered by 1990–A. Thus, no testimony supports the jury's verdict of $1,760,000 for 1990–A. The partnerships argue the jury's figure is supported by considering the percentage of 1990–A's investment in the investments of all the partnerships and multiplying that percentage by the total damages suffered by all the partnerships to determine 1990–A's proportional share of the total damages. This argument lacks merit because, unlike Foley's testimony about the five smaller partnerships, Harper never testified that 1990–A's damages were proportional to its investment in the partnership.[7] We conclude no evidence supports the jury's award of $1,760,000 to 1990–A. Accordingly, we hold the trial court did not err by reducing 1990–A's award of damages to $1,083,171, which is supported by Harper's testimony.

Appellees also assert the trial court erred in reducing HMY's damages from the jury's award of $220,000 to $136,200 and Greenwald's damages from the jury's award of $270,000 to $244,000. Appellees argue that the jury's award of damages is supported by Harper's testimony that HMY suffered damages of $201,550 and Greenwald suffered damages of $334,656. This "evidence" to which appellees cite was part of an offer of proof to the trial court and was not evidence before the jury. Appellees' argument lacks merit.

 Appellees also argue the jury's awards to HMY and Greenwald are supported by the evidence under Foley's second measure of damages. Foley testified the damages to the five smaller partner-

---

7. The jury awarded total damages of $5.5 million, of which 1990–A's award of $1,760,000 constituted 32%. However, according to Foley's testimony of the amount each partnership invested, 1990–A's investment was 30.645% of the total investment by the eight partnerships. Thus, the evidence shows the jurors did not award 1990–A its proportional share of the damages.

ships could be determined by multiplying the percentage of investment[8] by the range of damages of $1.25 million (market price) to $4 million (average price) to determine the damages suffered by each of the five partnerships. Using this method of calculation, Foley testified HMY suffered damages of $50,000 to $160,000, and Greenwald suffered damages of $78,750 to $252,000. Although Foley testified the total damages to all eight partnerships were $2.5 million to $6 million, he subtracted the damages suffered by 1988–B, $1.25 million to $2 million, from the total damages before determining each partnership's proportional share of the damages. Thus, the range of total damages Foley used to calculate each of the five smaller partnerships' proportional share of the total damages was $1.25 million to $4 million. Appellees argue that if HMY's and Greenwald's percentage share of the damages is multiplied by $6 million instead of $4 million to determine the high end of the range of their damages, the result is more than the jury awarded. However, no evidence supports departing from Foley's testimony of $4 million as the figure to be used for establishing the upper range of damages. Appellees' argument lacks merit.

We hold appellees have not shown the trial court erred in reducing the jury's award of damages to 1990–A, HMY, and Greenwald.

## Remittitur

After the trial court signed the January 29, 2002 judgment, appellants filed a motion for new trial and alternative motion for remittitur. In this motion, appellants argued:

> Remittitur is warranted because the jury's answers to each part of Question 4 are excessive, even after the reformation of those answers by the Court in its formulation of the judgment. In particular, and without limiting the generality of this paragraph, the jury's damage answers fail to reflect the reduction to present value of the (alleged) lost income stream to which the Plaintiffs' witnesses testified.

On April 15, 2002, after considering the motion, the trial court sent the parties a letter telling them the damages found by the jury should be reduced to present value: "I believe the court can judicially take notice of the law in Vernon's Texas Statues [sic] & Codes, and apply the tables contained therein, in order to arrive at a fair and reasonable discount rate." The trial court suggested a remittitur that would reduce the damages for 1990–A to $674,935.22, the damages for 1988–B to $1,302,302.00, the damages for Lazare to $579,492.76, the damages for HMY to $84,867.65, the damages to Kahn and Friedman to $37,386.63 each, the damages to Greenwald to $152,038.96, and the damages to Smallwood to $68,452.16. The suggestion of remittitur reduced the damages to approximately 62.311 percent[9] of the

---

8. Foley testified to the amount of money paid for the mineral rights for each partnership. His testimony about the percentage of investment of each of the five smaller partnerships does not completely correspond to his testimony about the amount of investment of each partnership. For example, Foley's testimony showed the total investment by all eight partnerships was $1,860,000, of which HMY's share was $45,000. That investment was only about 2.42% of the total investment, but Foley

testified HMY was entitled to 4% of the total damages based on its percentage of investment. Although portions of Harpers' and Foley's testimony may not "add up," no party complains about the accuracy of their calculations.

9. The record contains no evidence of how the trial court arrived at the decision to reduce the damages awards by this amount.

damages awarded in the January 29, 2002 judgment. On April 29, 2002, the partnerships filed the remittitur.

■ We review a trial court's suggestion of remittitur under the factual sufficiency standard. *Foley v. Parlier*, 68 S.W.3d 870, 886 (Tex.App.-Fort Worth 2002, no pet.). We uphold a trial court's suggestion of remittitur only when the evidence is factually insufficient to support the verdict. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex.1987); *Foley*, 68 S.W.3d at 886. In addressing a factual-sufficiency-of-the-evidence challenge upon a jury verdict, an appellate court must consider and weigh all the evidence, not just the evidence supporting the verdict. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex.2001); *City of Princeton v. Abbott*, 792 S.W.2d 161, 163 (Tex.App.-Dallas 1990, writ denied). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co.*, 46 S.W.3d at 242; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Durban v. Guajardo*, 79 S.W.3d 198, 208 (Tex.App.-Dallas 2002, no pet.); *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

■ In this case, the jury was instructed: "What sum of money, if any, *if paid now in cash*, would fairly and reasonably compensate the following Plaintiffs for their damages, if any, that were proximately caused by such fraud?" (Emphasis added.) This question instructed the jury to award the present value of the partner-

ships' damages. *See Samedan Oil Corp.* 78 S.W.3d at 453; *Rendon v. Avance*, 67 S.W.3d 303, 310-11 (Tex.App.-Fort Worth 2001, pet. granted, cause remanded w.r.m.); *Reliable Consultants, Inc. v. Jaquez*, 25 S.W.3d 336, 347 (Tex.App.-Austin 2000, pet. denied). We presume the jury followed the trial court's instruction. *Rendon*, 67 S.W.3d at 311.

The trial court's suggestion of remittitur appears to be based on its interpretation of Harper's and Foley's testimony as constituting evidence of a stream of income to the partnerships instead of the present value of the mineral interests. Applying the factual sufficiency standard of review, we will affirm the trial court's suggestion of remittitur only if the evidence is factually insufficient to show Harper's and Foley's testimony and the damages awards in the January 29, 2002 judgment constituted the present value of the mineral interests.

Harper testified that when valuing mineral interests, one values the gas reserves included in the mineral interests, just as in valuing a car dealership, one values the cars in the dealership's inventory. In this case, the issue is the valuation to be placed on the reserves appellants fraudulently represented were included in the mineral interests. Harper determined this value by multiplying the millions of cubic feet of reserves of which the partnerships were defrauded and which would have been credited to the partnerships[10] by a gas price. Harper used two different gas prices: (1) the "market gas price," which was the average price per thousand cubic feet of gas (MCF) each partnership received during eight years of production, and (2) the "average gas price," which was the average price per MCF in Oklahoma

10. As owners of the mineral interests, the partnerships would be paid the sale price for a percentage of the gas produced and sold.

for eight years. Harper further reduced the "market gas price" by discounting it by twenty-five percent. The discounted "market gas price" varied between the partnerships, but it was always less than the "average gas price" of $1.92 per MCF. The trial court applied the lower discounted "market gas price" in modifying the damages found by the jury for 1990–A, and the jury's awards to 1988–B and Lazare were substantially below Harper's testimony of their damages using the "market gas price." [11]

Appellants argue Harper's testimony was factually insufficient to establish the present value of the partnerships' damages because his calculations did not include a discount for the time value of money or the risk involved in the investment.

After reviewing all the evidence, we conclude the jury could find Harper's testimony using the discounted "market gas price" was evidence of the present value of the mineral interests at the time of the contracts. The jury could find that Harper's inclusion of a twenty-five percent discount in the "market gas price" was intended to discount the time and risk of the investment into the present value of the mineral interests. We conclude the award of damages based on Harper's discounted market price is factually sufficient. The January 29, 2002 judgment awarded 1990–A, 1988–B, and Lazare the same or less than the amount of damages to which Harper testified based on the discounted market price. Accordingly, the suggestion of remittitur was inappropriate as to these three partnerships.

As discussed above, the award of damages to the five smaller partnerships can be supported only by Foley's testimo-ny proportionately distributing the damages to those partnerships based on their investment. Like Harper, Foley figured the damages using both the discounted market price and the average price. Only the market price included a discount. The damages awarded the five smaller partnerships in the January 29, 2002 judgment greatly exceeded Foley's testimony of their damages under the proportional-distribution measure using the market price. Accordingly, we conclude the trial court did not err in determining the evidence was factually insufficient to support the award of damages to the five smaller partnerships and in reducing their damages accordingly.

We hold the trial court erred in suggesting the remittitur to 1990–A, 1988–B, and Lazare, and we hold the trial court did not err in suggesting the remittitur to the five smaller partnerships. We resolve the partnerships' first cross-issue in their favor in part and against them in part.

### CONCLUSION

The partnerships conditioned their second cross-issue, whether the trial court erred in applying the law of Virginia instead of Texas, on our remanding the cause for a new trial on other grounds. Having resolved the issues in the manner above, no remand for new trial is necessary. Accordingly, we do not reach the partnerships' second cross-issue.

We set aside the trial court's April 15, 2002 order granting remittitur and the partnerships' April 29, 2002 remittitur as to the 1990–A, 1988–B, and Lazare partnerships. In all other respects, we affirm the trial court's judgment.

MORRIS, J. dissenting.

---

11. For 1988–B, Harper testified its damages using the market price were $3,602,260 and using the average price were $5,470,464; the jury awarded 1988–B only $2,090,000. For Lazare, Harper testified its damages using the market price were $1,507,713 and using the average price were $2,228,580; the jury awarded only $930,000.

Dissenting Opinion by Justice MORRIS.

Although I disagree with the majority's analysis of several issues presented in this appeal, it is unnecessary for me to address all of them because I believe appellant's first issue is dispositive. In appellant's first issue, the central question is whether an opinion based on information known to be inaccurate is a misrepresentation of an existing material fact actionable as a claim for fraud under Virginia law. Unlike the majority, I conclude it is not. For an "opinion" to be actionable under Virginia law, it must be tantamount to an assertion of an existing material fact. *See Mortarino v. Consultant Eng'g Servs., Inc.,* 251 Va. 289, 467 S.E.2d 778, 781–82 (1996); *Horner v. Ahern,* 207 Va. 860, 153 S.E.2d 216, 220 (1967).

The representations appellants made about the gas reserves do not rise to the level of an affirmative assertion of an existing fact even though the opinions expressed may have been completely spurious. *See Saxby v. Southern Land Co.,* 109 Va. 196, 63 S.E. 423, 424 (1909) (the mere expression of an opinion, however strong and positive the language may be, is no fraud). Moreover, any statements appellants made about the "database" used to calculate the reserves were either true or commendatory, and thus not actionable. *See Tate v. Colony House Builders, Inc.,* 257 Va. 78, 508 S.E.2d 597, 600 (1999). The majority states that appellants' opinions are "subject to a claim for fraud because they are opinions which were supposed to be based on particular data and calculations using the data." In other words, the majority suggests that the opinions in this case are actionable because appellants falsely represented that the database underlying the reserve opinion would be used in a certain way and appel-

lants then used a different process to formulate their opinion about the gas reserves. Such a representation, however, does not change the reality that appellants' ultimate opinion about the gas reserves was not an assertion that the reserves existed as a matter of fact.

Distilled to its essence, the majority opinion says that if one states an opinion without an objective, justifiable basis, then it is actionable as fraud under Virginia law. Such reasoning would contort every opinion made in bad faith into a misrepresentation of an existing fact. Virginia law does not allow such legal gymnastics, but instead firmly states that opinions are not actionable in fraud unless they assert and misrepresent material facts. *See DeJarnette v. Thomas M. Brooks Lumber Co., Inc.,* 199 Va. 18, 97 S.E.2d 750, 757 (1957).

Because no evidence supports the finding of a material misrepresentation of an existing fact in this case, I would sustain the first part of appellants' first issue, reverse the trial court's judgment, and render judgment that appellees take nothing by their fraud claims.